[L. A. No. 17588. In Bank.—January 29, 1941.]

JOHN E. STALEY, Petitioner, v. THE STATE BAR OF
CALIFORNIA et al., Respondents.

John E. Staley, *in pro. per.*, and John W. Preston for Petitioner.

Claude Minard for Respondent.

EDMONDS, J.—Upon the application of the petitioner, who failed to pass the bar examination held in 1939, this court issued an alternative writ of mandate requiring the Committee of Bar Examiners and The State Bar to show cause why he should not be admitted to practice law in this state. He charges that although he passed the examination with a higher grade than 70 per cent, the board "arbitrarily and capriciously" reduced this to below a passing mark and refused to certify his name for admission to the bar.

In support of his charge against the committee, the petitioner alleges that he "successfully completed the law course" of the University of Michigan in 1914, and also "successfully completed" a post graduate course in legal instruction at Southwestern University, Los Angeles. He also states, generally, that he has the legal learning and ability of the average candidate who successfully passes the bar examination of the State of California. More specifically, he alleges that he has been a commissioned officer in the armed forces of the United States and studied and passed the subject of military law, and that he has practiced before the Industrial Accident Commission with great success.

In a supplemental petition, the petitioner has set out in full the questions asked of him, the answers given, and the grade assigned to each. These grades amount, in the aggregate, to 940 points as against the 1820 required to pass. In criticism of such marking, there is presented a certificate of Charles E. McGinniss that he has read the petitioner's papers and has assigned to his answers a total of 2,121 grade points, which is above the passing grade. Mr. McGinniss states that he is a member of the California bar, that he has been a law editor and professor of law, and that in his opinion the petitioner "is educationally qualified to practice law in the State of California and elsewhere."

By their return, the respondents deny that the petitioner's answers were arbitrarily or capriciously graded. It specifically alleges that his answers to the questions asked of him were carefully, fully and completely read and graded by highly skilled readers who were chosen for their ability to do this work, and it sets forth in detail the methods under which the examination taken by the petitioner was carried on. It also alleges that the records of the committee show that the petitioner has taken eight examinations since the year 1926, and has passed none of them although each examination was determined on its own merits. It also denies that the petitioner successfully completed the regular academic course of law at the University of Michigan, asserting that although the petitioner was at one time a student there, he did not pass a sufficient number of subjects to entitle him to a degree.

The allegations of the petitioner amount to nothing more than a general statement that his answers entitle him to a passing grade notwithstanding the grade given his papers by the Committee of Bar Examiners. He makes no charge of fraud, imposition or coercion, and does not assert that he was denied a fair opportunity to take the examination.

Such a petition falls far short of the requirements laid down by this court in a proceeding to review the examinations given by the committee in 1933. At that time it restated the rule which had been adopted in a previous consideration of the question as follows: ''The attitude of this court is that if any dissatisfied applicant can show that he was denied passage of the state bar examinations through fraud, imposition, or coercion, or that in any other manner he was prevented from a fair opportunity to take the examinations, this court will be willing to listen to his complaint. Inability to pass the examinations, which are successfully passed by other applicants, will, of course, not be inquired into by the court. Also, as you have no doubt found out, one's general qualifications are not to be substituted for the requisite knowledge of law which one must possess in order to be admitted into the legal profession.'' (*In re Admission to Practice Law,* 1 Cal. (2d) 61, 64 [33 Pac. (2d) 829]. See, also, *Salot* v. *State Bar,* 3 Cal. (2d) 615 [45 Pac. (2d) 203]; *Spears* v. *State Bar,* 211 Cal. 183, 191 [294 Pac. 697, 72 A. L. R. 923].)

The burden is on the petitioner to show wherein the determination of the board was incorrect or unfair, and this court will not assume from the statement concerning his general qualifications that it was impossible for him to receive the grades given by the Committee of Bar Examiners.

The alternative writ of mandate is discharged and a peremptory writ denied.

Gibson, C. J., Traynor, J., and Spence, J., *pro tem.*, concurred.

HOUSER, J., Dissenting.—I dissent.

Section 6060 of the Business and Professions Code contains various provisions which relate to the qualifications necessary to be possessed by applicants for admission to practice law in this state, which provisions, among others, include the following requirements: That such applicants shall "Before beginning the study of law, have completed at least two years of college work or have reached the age of twenty-five years"; shall have either "Graduated from a law school accredited by the examining committee requiring substantially the full time of its students for three years . . . ; Graduated from a law school accredited by the examining committee requiring a part only of its students' time for four years . . . ; Studied law diligently and in good faith for at least four years . . . ; [and] Have passed a final bar examination given by the examining committee".

The sub-title to section 6066 of the same code is "Appeal to Supreme Court". The language of that section is as follows: "Any person refused certification to the Supreme Court for admission to practice may have the action of the board, or of any committee authorized by the board to make a determination on its behalf, pursuant to the provisions of this chapter, *reviewed by the Supreme Court,* in accordance with the *procedure* prescribed by the court." (Emphasis added.)

From the title of section 6066 and the language employed in said section, it is clearly apparent that in enacting such provision it was the intention of the legislature to give to a rejected applicant for admission the right to "*Appeal* to [the] Supreme Court" from a "determination" or "action of the board, or of any committee authorized by the board to make a determination on its behalf",—and thereupon to

have such "determination" or "action . . . *reviewed* by the Supreme Court". And, in that connection, it would seem extremely unlikely that by such enactment the legislature ever contemplated anything other than that on the taking of such an appeal the Supreme Court, by and through the members thereof, would actually personally *review* the "determination" or "action" by the board of governors, or its examining committee, by a genuine and painstaking re-examination of the several questions which theretofore had been propounded to the applicant, as well as the respective answers which had been made by the applicant to such questions,—and thereupon, as an independent action by the court, reach a conclusion on the question whether in truth and in fact the applicant was *entitled* to be admitted to practice law in this state. In my opinion, the fact that by the terms of the statute the Supreme Court is authorized to prescribe the *"procedure"* to be followed in such a matter cannot affect the *substantive* right that is conferred upon the applicant to have his examination papers *"reviewed"* by this court. In other words, other than by prescribing *"procedure"* this court has no authority to legislate and thereby attach conditions under which the right of the applicant may be affected. Nor can the fact that literally hundreds of rejected applicants simultaneously may seek relief from a situation identical in all respects with that here presented alter or in anywise affect the substantive right accorded to each of such individual applicants. The time of the Supreme Court may be, and without doubt is, fully occupied with the ordinary business of the court; but that fact should not of itself present a good or a sufficient reason for it either to neglect or to refuse to perform the additional and burdensome duty thrust upon it by reason of such legislative enactment. Clearly, any *"procedure"* which this court may adopt in the premises must relate not to any diminution of the primary right of a petitioner, but, rather,—as is indicated within the terms of the act,—must be concerned solely with the manner in which he must act or proceed in bringing to the official attention of the court the essential fact that he is or has been an "unsuccessful applicant for admission to practice, after he has taken any examination" (sec. 6065, Bus. & Prof. Code), and that the board of bar governors has "refused certification to the Supreme Court

for [applicant's] admission to practice" (sec. 6066, Bus. & Prof. Code).

In his petition for "review", neither by express language contained in the statute, nor by any meaning to be implied therefrom, is the rejected applicant required to ascribe any reason, whether real or fanciful, why the board refused to certify the fact that he be entitled to be admitted to the practice of law in this state. However, as is stated in the prevailing opinion herein, the instant proceeding is a hearing by this court which has occurred by reason of the fact that heretofore, at the instance of petitioner, an alternative writ of mandate was issued by which *"the Committee of Bar Examiners and The State Bar"* were required "to show cause why he [petitioner] should not be admitted to practice law in this state". By its judgment, as is expressed in its majority opinion herein, this court has decided that "The *burden* is on the *petitioner* to show wherein the determination of the board was incorrect or unfair, . . . " (Emphasis added.) It here may be noted that the bar of this state formerly—although possibly erroneously—has entertained that which now may be termed a ridiculous notion, to wit: That when, as a consequence of the issuance of an alternative writ of mandate, the *respondent* therein has been specially directed or ordered to *show* cause why the said respondent had not pursued a designated course, as expressly indicated in such order,—in response thereto,—the final duty was cast upon such respondent (and not upon the petitioner for the writ) to actually *show cause as directed*. (Sec. 71, "Mandamus", 16 Cal. Jur., p. 875.)

Within the prevailing opinion herein the rule is quoted that, in a proceeding of this kind, unless the *petitioner* therein made a showing of "fraud, imposition, or coercion", or that he had been denied "a fair opportunity to *take* the examinations", this court would not "be willing to listen to his complaint". (Citing *In re Admission to Practice Law,* 1 Cal. (2d) 61, 64 [33 Pac. (2d) 829] ; *Salot* v. *State Bar,* 3 Cal. (2d) 615 [45 Pac. (2d) 203] ; *Spears* v. *State Bar,* 211 Cal. 183, 191 [294 Pac. 697, 72 A. L. R. 923].) However, on examination of the cited authorities, particularly with respect to the facts of those respective cases, it becomes apparent that none of them is clearly applicable to the factual situation here involved. Moreover, the rule set forth in the pre-

vailing opinion, as was announced in *In re Admission to Practice Law*, 1 Cal. (2d) 61, 64 [33 Pac. (2d) 829], was amplified in the later case of *Salot* v. *State Bar*, 3 Cal. (2d) 615, 617 [45 Pac. (2d) 203]. In that case, following the statement that the remedy (if any) of a rejected applicant for admission to practice law in this state in effect must be based upon "fraud, imposition, or coercion", the important, if not controlling, and necessarily essential and conclusive language of the court is: *"or that he has been treated unfairly or unjustly"*. (Emphasis added.) It therefore would seem to follow that even though a petitioner be unable, or should fail, to *show* either "fraud, imposition, or coercion", nevertheless (assuming that the burden is upon him), if he can show that he has been treated either "unfairly or unjustly", he still may be entitled to the relief which he seeks.

Considering the complete language of the announced rule (*Salot* v. *State Bar,* 3 Cal. (2d) 615, 617 [45 Pac. (2d) 203]), and both the circumstances prior to and ordinarily following the process of examining applicants for admission to practice law in this state, it is difficult, if indeed possible, to comprehend the reason (if any) for the use in the announced rule of the words "fraud" and "coercion". Manifestly, the facts relating to any alleged fraud (except with respect to constructive or implied fraud) which was or might have been practiced upon an applicant would not be available to him; and how or in what manner any applicant could or might be "coerced" with reference to his examination must be and forever remain a dark and deep secret! But as to the significance of the word "imposition", it is clear that the existence of circumstances might have been surmised which would or did justify its use. As presently employed, it probably imports something akin to the words "unfairly or unjustly", which so closely follow the formed word. But, again considering the nature of the proceeding at bar, it is beyond ordinary comprehension how petitioner properly could complain of an assumed fact "that in any . . . manner he has been *prevented* from a fair opportunity to *take* the examinations". (Emphasis added.) . Certain it is that such a situation did not obtain herein. In the main, petitioner's complaint consists not in the fact that he was *prevented* from *taking* the examination but is to the effect that in the grading which was given his answers to the questions that were pro-

pounded to him he was either imposed upon, or he was treated "unfairly or unjustly"; and in order to illustrate such asserted fact to the ordinary mind, or to induce such a conclusion by this court, he has submitted with his petition a *verbatim* copy of the several questions and his respective answers thereto. They are as follows, to wit:

[*The following material is quoted from the official questions submitted to and answers written by petitioner John E. Staley.*]

## "QUESTIONS AND ANSWERS AS SUBMITTED TO JOHN E. STALEY IN THE BAR EXAMINATIONS OF OCTOBER, 1939.

### BOOK I.

Question No. 1. Grade 45.

Question No. 2. Grade 30.

Question No. 1.

Peters owned two cows, Nellie and Bossy, which he grazed upon his ranch, Blackacre. Nellie was stolen in August, 1935, by a neighbor, Daniels, who regularly used her in his dairy until September, 1937, at which time he sold her by bill of sale to one Smith, who was unaware of her previous theft by Daniels. Smith has since kept her together with a calf to which she gave birth in October, 1937.

Bossy was wrongfully converted by Daniels in August, 1938. Peters secured a judgment for her value against Daniels in July, 1939, but has been unable to collect anything thereunder.

In August, 1939, one Jones removed some grain worth $100 from Blackacre in the honest belief that the particular area from which the grain was taken was part of an adjoining tract which he had leased. Jones has made liquor worth $210 from the grain.

All of the above facts occurred in the State of Magenta, which has a statute providing that an action for the recovery of personal property must be commenced within three years. In October, 1939, Peters asks you whether he is entitled to recover either by suit or peaceable self help:

(1) Nellie and her calf from Smith

(2) Bossy from Daniels

(3) The liquor or the value thereof from Jones

Answer No. 1.

(1) It is elementary law that a thief can never give title to the stolen property so it is apparent that Daniels could not confer title in his transfer to Smith.

As the possession of Smith commenced on Sept. 1937, the three year statute of limitations is not applicable. Smith being unable to convey any title; Daniels is regarded as having only the right of temporary possession until such time as the owner, Peters, chooses to take appropriate steps to recover "Nellie."

As Daniels did not acquire any title to "Nellie" from this it follows that he could not convey any and the calf of "Nellie" is the property of the owner of the animal but as title remained at all times in Peters, the natural increase of the cow "Nellie", being her calf, is the property of Peters.

The good faith of Smith in buying the cow from Daniels does not enter into the question as a thief cannot pass title.

The right of self help exists on the part of Peters and he may peaceably take Nellie and her calf from Smith and he has the additional legal remedy of what is known in common law states as Replevin and in the code states as Claim and Delivery, in instances where a particular chattel or personal property is demanded by the owner.

(2) As Peters has a judgment in the instance of "Bossy", all of his remedies have been merged in the action in which he secured his judgment. One has an election of remedies and in commencing an action he may take his choice but when action is taken there is a merger of such remedies in the final judgment. Where remedies are inconsistent; the choice of one and its culmination in judgment bars the use of another.

As the right of self help is inconsistent with the action taken by Peters in the case of "Bossy"; he cannot exercise "self help."

(3) As the mistake of Jones was not in any way induced by Peters no element of estoppel exists as to the parties. Something more than an "honest belief" on the part of Jones must exist. There must have been some act or omission on the part of Peters. The leading case on this subject is the California case of *Biddle Boggs* vs. *Mining Co.*, reported in 14 Cal. 297. This case lays down the law regarding boundaries and estoppel. There must have been a misrepresentation on the part of Peters or a statement as to

boundaries made with knowledge of its falsity or in reckless disregard of the truth, coupled with an intention for the other party to act but none of these elements exist.

Peters would have been entitled to the grain and the question arises as to whether the change of the grain into liquor by the process of distillation defeats Peters in his right to recover.

Jones in taking the grain was a mere trespasser and his honest belief does not alter the legal situation for the reasons stated.

The change in character from grain to liquor does not defeat the right of Peters to recover his property and if the law were otherwise the rightful claim of an owner to property could be defeated by a change of form.

This being so Peters has the right of peaceable self help as Jones was a mere trespasser in the acquisition of the grain. The change of form from grain to liquor does not defeat this right and while Peters by taking the liquor acquires the right to seize his property in the altered form as the law regards the liquor as the property of Peters.

Peters has the additional right of legal action. He may sue Jones for conversion of property or bring an action for a money judgment for the value of the grain. He could not recover for the value of the liquor as the law of damages limits him [to] the value of the grain and any injury to his freehold.

As the value of the liquor exceeds that of the grain by $110, it is obvious that the right of self help is the more advantageous of the remedies.

While it might seem harsh that Jones should lose the additional value enhanced in the process of distillation yet the law regards him as a wrongdoer in the first instance even though he acted in good faith.

Question No. 2.

Knapp owned in the State of Magenta two tracts of Land, Blackacre and Whiteacre. Blackacre he was induced to sell and convey to Brown through the fraud of the latter. Brown in turn sold and conveyed the land to Black, who had no notice of Brown's fraud and paid value for the land.

Later Knapp discovered the fraud which had been committed against him and went into possession of Blackacre, claiming that the sale to Brown was void. He stayed in

possession for one year, planting and harvesting a crop of wheat. While the grain was still lying in sacks on the ground, Black, who, not having occupied the land himself after his purchase, had just learned of Knapp's action, peaceably retook possession of Blackacre and claimed the grain as his own.

Meanwhile Knapp had leased Whiteacre to White for five years beginning January 1, 1937, at a yearly rental of $1,000, payable on the first of each year. In December, 1937, White abandoned the premises. In February, 1938, he mailed the keys to the farmhouse and other buildings on the premises to Knapp, saying he repudiated the lease. Knapp kept the keys but at no time after White's abandonment attempted to communicate in any way with him, and on February 2, 1939, he relet the premises to another for the remainder of the original term at a yearly rental of $500 the most he could reasonably secure.

Knapp now asks you:

(1) Whether he is entitled to the grain on Blackacre;

(2) What his rights are against White, only the first year's rent ever having been paid under the lease of Whiteacre.

Advise Knapp.

Answer No. 2.

(1) Black was an innocent purchaser for value of Blackacre and he received a good title from Brown as Black acted without any notice, actual or constructive of the fraud of Brown.

Knapp in going onto Blackacre and planting the crop was a mere trespasser and as Black did not know of Knapp's act until after the grain had ripened, there is no element of estoppel present. (*Biddle Boggs* vs. *Merced Mining Co.*, 14 Cal. 279.) Black having not only the title but the right to possession at all times was entitled to the grain.

Knapp is not entitled to the grain.

(2) The legal question involved is whether Knapp in renting Whiteacre after the default of White, has waived his right to recover for the entire term of White's lease. White in mailing back the keys and repudiating the lease clearly demonstrated his intention of non-compliance with the terms of the lease.

Under these circumstances the owner, Knapp, had the right to rent the property to another and treat the lease to White

as breached by White. Knapp would not be required to keep the property vacant and subject to the occupancy by White as White has clearly shown he would not reoccupy. Knapp had the right to diminish damages by renting his property to another and Knapp may sue White for the period of January 1938, to February 2, 1939; at the rate of $1000 a year, and from February 2nd, 1939, to date of filing suit at the rate of $500 being the difference in the lease price and the actual second rental and Knapp may sue for such period of rent on the basis of yearly loss of $500; or Knapp may elect to wait until just before the period of 4 years from December 1937, the date of default, and sue White for the accumulated damages based upon the yearly rental of $1000, while the property was vacant and the loss of $500, at a yearly rate under the second letting.

As we have a four year period of limitations for bringing actions under an instrument in writing; Knapp if he elects to wait instead of suing White, each year for the loss; may later sue at the end of the fifth year for the difference in rent; as the breach would have been for the last year of the lease.

## BOOK II.
Question No. 3.   Grade 35.
Question No. 4.   Grade 30.

Question No. 3.

Adams, who had for ten years owned Greenacre, having an opportunity to purchase Blackacre at an exceptionally low price, decided to buy the tract and to organize a corporation to which he could sell the two pieces of land. Greenacre had originally cost Adams only $100,000 but its present market value is $200,000. Adams paid $50,000 for Blackacre, although its present market value is $100,000.

In pursuance of his plan, Adams organized the Enterprize Corporation, installed his wife and two sons as the first directors, and caused stock to be issued to the public. The corporation then purchased Greenacre and Blackacre from Adams for $200,000 and $100,000, respectively. Shortly, thereafter, a new board of directors was elected and now desires to bring suit against Adams.

(1) What damages, if any, can the corporation recover from Adams as a result of its purchase of Blackacre? Greenacre?

(2) Is the corporation liable to Adams for the reasonable amount of the expenses he incurred in organizing the corporation?

(3) Discuss the liability of the corporation and of Adams on a contract made by Adams prior to incorporation in the name of "Enterprize Corporation" with one Thomas, who agreed to furnish certain goods to the corporation for six months after incorporation at a stipulated price.

The corporation received the goods knowing of the contract made by Adams, but now refuses to pay Thomas on the basis that neither its board of directors nor officers had taken any action to affirm the contract.

Answer No. 3.

(1) It is assumed that the time of organization of the Enterprize Corporation is contemporaneous with the "present market value" of the parcels of land involved. Under this assumption there would have been no fraud or unfairness on the part of Adams.

A corporate officer has a fiduciary relation regarding the corporation. He may not make secret profits and in all his dealings with the corporate property he is required to show good faith.

While there had been an increase in the increment of the parcels of land involved it seems that Adams could have marketed the land at the time he sold it to the corporation for the same price. This being true, there was no advantage gained by Adams. The circumstance that his relatives were also officers does not affect the situation as there is not any breach of fiduciary relation on the part of Adams.

The corporation cannot recover on either parcel as they did not sustain any loss and there was no irregularity as a corporate officer in the conduct of Adams.

(2) A corporation is liable for the reasonable amount of money in the form of expense incurred and paid by one of its officers but where the expense is incurred only the money may never be paid. Adams has only a contingent liability for them but until his liability becomes absolute by payment by him the corporation would not be liable.

(3) While there was no corporate entity at the time that Adams contracted with Thomas, yet when the Enterprize Corporation received the goods, knowing that Adams had contracted with Thomas anticipating the formation of the cor-

poration; the Enterprize Corporation ratified the act of Adams.

Under the law of Agency the acts of an agent, who was not at the time authorized to act, may be ratified and this may be done by assuming the benefit of the acts of the agent.

The corporation cannot both hold the goods and refuse to pay. Formal ratification is not required as the corporation has retained the goods. The retention of the goods purchased by Adams is an act of ratification and the corporation must pay the stipulated price.

Question No. 4.

On a trial for the murder of P, D's defense is that P was the aggressor and that D reasonably believed it necessary to shoot P in self-defense. D offers to prove that P and D had been rivals for the same girl, that P had approached D with a gun in his hand, and that P, as D learned after the killing, had told others shortly before that he would kill D on sight.

D offers testimony of W, a service station attendant, that W saw P shortly before the shooting heading toward D's house, that P "appeared to be angry" and that he was then carrying a weapon (previously introduced in evidence) which, though in fact incapable of shooting, "would reasonably be mistaken for a real gun."

On cross-examination of W the prosecution asks him if he is related to D and the witness answers "No." The prosecution then asks W his age. He replies "25." The prosecution now offers the testimony of C, cousin of W's, that W is a relative of D's and that W had a day before, at W's house, told C of the relationship. The prosecution also offers a certified copy of W's birth certificate showing him to be 30 years old.

(1) For what purposes, if any, may the statements made by P be introduced?

(2) Is W's testimony admissible?

(3) Is C's testimony admissible?

(4) Is the certified copy of the birth certificate admissible?

Answer No. 4.

(1) The statements of "P" are not admissible for any purpose as it appears that such statements were not communicated to "D" until after the killing; and as the pretended weapon would not in fact shoot; the declarations of "P" could not be introduced even for the purpose of proving a plan of action. While statements of an assailant to homi-

cide cases are admissible for the purpose of proving a plan of action or for the purpose of showing that the defendant had known of the statements and on that basis had reasonable cause to fear for his life; the circumstances of this case do not warrant the introduction of "P's" statements.

In self defense it is required to show that the threats were communicated; that they were believed by the defendant and that the defendant also believed that the assailant also had the power to execute the threats at the time of the act.

(2) Under section 2052 of our Code of Civil Procedure, a witness may be impeached by asking him regarding inconsistent statements made at variance with his testimony. The procedure is to ask the witness if he made such statements; if he wishes to explain them, and then to introduce the impeaching testimony. The first step is "laying the foundation" and the second is the impeachment. The inconsistent statements may have been made out of court and if they are material or relevant and not incompetent, they may be introduced.

W may be impeached by showing that he stated falsely regarding his age as the court or jury may be entitled to this information in forming an opinion as to the maturity of the witness.

His relationship, according to his statements may also be shown as it would prove bias and favor. The principle of "falsus in uno falsus in omnibus" enters.

(3) The statement of "W" may be proven by "C" as the latter is an impeaching witness. The law regards one who makes inconsistent statements as subject to impeachment.

(4) Yes. The court or jury estimate the witness by his age, among other attributes; and the copy of the birth certificate being certified it tends to show that "W" testified falsely. It is conventional procedure, in examining a witness to ask him about his age, among other qualifications. The cross examining attorney may impeach the witness by introducing the certificate.

### BOOK III.

Question No. 5. Grade 20.
Question No. 6. Grade 15.

Question No. 5.

A owned a bull known by him to be extraordinarily vicious. One day the bull escaped from A's pasture without negligence

on the part of A, and entered B's land. B saw the bull rush at him, but carelessly waited too long before running for cover and was gored. C, the wife of B, was standing with B when the bull appeared; she ran at once, but in her excitement tripped and fell, thereby suffering a minor injury. She then managed to proceed to safety. However, she sustained fright and mental shock resulting from realization of her own danger and her husband's injuries, and she ultimately suffered a miscarriage therefrom.

For what, if anything, may B and C, or either of them, recover? Discuss fully.

Answer No. 5.

The degree of care which the law requires "A" to manifest in the custody of a domesticated animal seems to have been satisfied in this case. While an owner of a domestic animal might, under some circumstances, be held liable when the owner had notice or knowledge of the vicious propensities of the animal; in this case it appears that the escape of the bull from the pasture was "without negligence on the part" of "A".

The law does not impose upon the owner of a domesticated animal the same extraordinary degree of care that it imposes upon one who harbors a wild animal. The owner of domesticated animal is not absolutely liable for any damage caused by the animal even tho' he knew its vicious propensities.

Applying the rule above stated in reference to the facts of the case it seems that "B" in carelessly waiting too long was guilty of contributory negligence and that bars his recovery.

The law consistently refuses to give damages for mere mental shock or nervous fright. The cases hold that there must be some actual, physical injury, before one may recover. The statement of facts concerning "C" states a minor injury but she managed to proceed to safety. The miscarriage suffered by "C" was not directly resultant from any actual injury inflicted by "A's" bull and she cannot recover for that.

The recovery of "C" would be limited to the minor injury mentioned in her escape; if there had been negligence on the part of "A" but as there was none there can be no recovery.

Question No. 6.

A agreed in writing with B to sell B a specified pleasure car which he promised to deliver to B "as soon as it could possibly be secured from the factory." In consideration thereof, B promised to pay $1500 "if A delivered the car with reasonable promptness after the same could be obtained from the factory." A delivered the car to B's premises, during the latter's absence, two days later than it would have been possible for him to do so. B refuses to keep or pay for the car.

B has also written C, his nephew, that in the event C took a trip to Alaska, B would give him a new Packard Six coupe. C did take the trip, but B refuses to give him the car.

A and C now threaten suits against B, who asks you whether:

(1) A has a cause of action for breach of contract;

(2) C has a right to damages for non-delivery of the car.

Advise B.

Answer No. 6.

(1) The provision in the agreement regarding delivery "as soon as it could possibly be secured from the factory" is modified by the other clauses to the effect that delivery would be made "with reasonable promptness." A period of two days, in itself, is not an unreasonable lapse of time for the delivery to the residence of "B". While the car could have been possibly delivered sooner; it was delivered with reasonable promptness.

In the absence of any stipulation regarding the place of delivery it was proper for "A" to deliver the car to "B's" premises.

"A" has a cause of action against "B" for breach of contract.

(2) "C" has no cause of action against either. There was no privity of contract between "A" and "C". "B" is not liable to "C" for the reason that the law does not regard a promise of the character of the one that "B" gave to "C" as actionable. The question is not justiciable.

The advice to "B" is to accept the car or to suffer suit at the hands of "A" for the amount of the profit that "A" would have made from the sale.

## BOOK IV.

Question No. 7.   Grade 35.
Question No. 8.   Grade 10.

Question No. 7.

Ben Actor has retired and lives comfortably upon the income and proceeds from large investments made during earlier years when he was world renowned as a playwright and actor. His only activity is the occasional uncompensated coaching of members of the "Actor Repertory Players, Inc." a professional dramatic company which regularly sends a troupe of players on tour in the United States. The playbills usually refer to the fact that Actor has personally coached most of the players.

Alex Lear, an unprincipled rival of Actor's in the old days, and presently owner of a competing dramatic company, is writing his memoirs to be published soon in a national magazine of wide circulation. In one of his chapters he describes a certain illicit affair Actor is said to have carried on clandestinely with his leading lady, and states that Actor today is secretly supporting an illigitimate child which resulted from said affair. This story is untrue, as Lear knows.

The articles constituting these memoirs also are to contain the following: "Now he is patriarchal godfather to the anaemic 'Actor Repertory Players, Inc.'—which contributes its chapter to the history of the illegitimate stage by subsisting upon the fruits of stolen copyrights and by bribing critics for the few favorable reviews its performers so consistently never deserve." These charges are false, as Lear knows.

Lear also has hired a number of thugs who are to kidnap Ima Beauty, the leading lady of "Actor Repertory Players, Inc." upon the nights of important engagements.

As attorney for Actor, "Actor Repertory Players, Inc." and Beauty, give your opinion, with reasons, as to what injunctive relief, if any, will be extended your clients against the threatened wrongs.

Answer No. 7.

Injunctive relief lies, in other proper cases, where there is no plain, speedy nor adequate remedy at law.

While an injunction will not issue merely to restrain the commission of a crime; yet where the threatened act is also

violative of a property right and damages at law would not suffice, injunctive relief may be given.

Ben Actor has no property right to be protected as his services are contributed and voluntary and while his professional reputation might and probably would be damaged, it appears that he is retired from the acting profession.

Ben Actor cannot make out a case for injunctive relief.

The "Actor Repertory Players" have a property right which can and should be protected by injunctive relief. While there is also a legal remedy, the threatened publication should be restrained for the reasons that the libel laws would not secure to the "Actor Repertory Players, Inc." the full measure of relief which could be obtained by injunction.

The actors themselves are distinct entities from their corporation. While the corporate entity is damaged yet the actors who function under it are likewise injured; even tho' they are not named as individuals. If the corporation, as an artificial person has a property right, and it has; that right may only be fully protected by injunctive relief. A multiplicity of suits is apparent.

Ima Beauty is also entitled to injunctive relief for the reason that the sufficiency of her legal remedy does not meet the test laid down above. A multiplicity of suits would be involved in litigation in behalf of Ima Beauty. Even if such suits were instituted and the Defendants were able to, and did respond in damages, injuries suffered by her might terminate her professional career. The right of "Ima Beauty" to star in the various performances is a property right which should be protected by injunction. Equity will protect such a right even tho' a crime is also involved.

Question No. 8.

Daniels walked into a drug store operated by Peters, went to the cigar counter, and selected three cigars, handing Peters a twenty-dollar bill. Peters handed Daniels his change, which included a ten-dollar bill.

Daniels then reached in his pocket and said: "Pardon me. I don't have to take all your change. I just discovered I have a one-dollar bill." "Fine," replied Peters. Daniels then purported to hand Peters the change he had been given, but "palmed' the ten-dollar bill and did not return it. Peters thanked Daniels and returned the twenty-dollar bill.

Immediately after Daniels left the store Peters discovered his loss. Daniels did the same thing in another drug store a few hours later, but was apprehended as he left the store.

With reference to his activities in Peters' store, of what crime or crimes is Daniels guilty?

Answer No. 8.

Daniels is guilty of Theft as his acts, under common law would amount to embezzlement and under our Penal Code the distinction between larceny and that crime are abolished and both are made Theft. The value being ten-dollars, the crime is petty theft.

Daniels is also guilty of obtaining money by false pretenses as he is using a trick and device within the meaning of our Penal Code. The intent to work a scheme by trick and device is shown by the operations of Daniels in the other store following his commission of the act in the store of Peters.

BOOK V.

Question No. 9.    Grade 55.

Question No. 9.

Mitchell was a member of the Interstate Commerce Commission. The act under which he had been appointed by the President with the advice and consent of the Senate provided that a Commissioner could be removed by the President for "inefficiency, neglect of duty, or malfeasance in office." The President, however, removed Mitchell because of differences in political philosophy, although disclaiming the imputation of any wrongdoing by Mitchell.

The City of Fairview, State of Magenta, passed an ordinance making it a misdemeanor to maintain a brick kiln, whether established prior or subsequent to the effective date of the ordinance, within a described residential district of the city. Mitchell maintains and had maintained for several years prior to the ordinance, a brick kiln within the prohibited area. Enforcement of the ordinance would decrease the value of his property 50 per cent.

The State of Magenta also enacted a statute setting up a board of censors and prohibiting under penalty of fine and imprisonment the exhibition of motion pictures other than those found by the board to be "moral, educational, or amusing and harmless in character." Mitchell owns a motion picture house in Magenta.

Discuss the constitutionality, as applied to Mitchell, of:

(1) His removal by the President from the Interstate Commerce Commission.

(2) The ordinance prohibiting the brick kiln;

(3) The statute providing for censorship of motion pictures shows.

Answer No. 9.

(1) This seems to be "on all fours" with the Humphrey's Case. Humphrey was a Commissioner, appointed under a previous administration and President Roosevelt sought to remove him from office under substantially the same theory mentioned in the question.

The Supreme Court of the United States in reviewing the Humphrey case held that as the advice and consent of the Senate was necessary to the appointment, that a difference in political philosophy, or social or economic views between the Commissioner and the President was not a ground for the removal of Mr. Humphrey.

The only authority for removal is found in the act and in the course followed the President acted without authority of law. On the basis of the Humphrey case; the removal was contrary to organic law because the mode of removal, provided for in the Statute was not followed. When an office is created by an act under the authority of the Constitution the method of removal under the Act must be followed. It follows that Mitchell is entitled to the office.

(2) It has been generally held that if an occupation or calling is followed, that is not in itself a nuisance *per se,* that ordinances of the nature of the one under consideration are violative of constitutional rights.

While the Police Power extends to the making of laws for the General Welfare, Sanitation, Health, Safety, Morals and like purposes; it has been held that this power cannot be used to prohibit the operation of a business that does not, in itself, conflict with any of these purposes and that where one had established a business or calling prior to the enactment of such an ordinance, that the ordinance conflicts with the right of the proprietor to conduct such business as it would be a taking of property without due process of law.

(3) The valid exercise of the Police Power includes legislation enacted for the protection of the morals of the people.

It would be difficult to conceive a more potent and widespread means of propagation of public thought than is to be found in motion pictures.

Motion Picture theatres are to be found in every city and almost every town in the United States.

If films could be made and exhibited without censorship by a State; the State would lose effective control over the most powerful means of influencing public morals than any other agency, with the exception of the press; and probably many of our people are influenced by motion pictures who are not influenced at all by newspapers.

This is because the influence of the paper is usually found in its editorial section while the influence of the movie comes, unconsciously, to the audience in the form of entertainment.

While the language of the statute is very broad and general, it seems to contain sufficient terms to be a valid exercise of the Police Power of the State. The word "amusing" is liberally defined to mean "entertaining."

Each state has the right to enact suitable legislation for the protection of the morals of their people and in this case, it is properly exercised, altho' the language of the Statute could be greatly improved.

BOOK VI.

Question No. 10. Grade 40.
Question No. 11. Grade 75.

Question No. 10.

Adams, Blake, and Clay constituted the board of directors of the Drumm Corporation. At a meeting of the shareholders a committee was elected to advise the directors on matters of corporate management. The directors having indicated that they were considering executing a certain contract within the scope of the corporate business, the committee counselled against the advisability and the shareholders at a special meeting unanimously passed a resolution in opposition to making the contract. Neverthless, the directors entered into the contract, which it is conceded was reasonably appropriate for corporate purposes.

Adams was a man of nationwide reputation who had been induced to serve gratuitously as a director in order to lend prestige to the corporation. Inasmuch as he resided at a great distance from the corporation and was extremely busy,

Adams was told by the president of the corporation, at the time he became a director, that he would not be expected to attend meetings or engage actively in the management of the corporation.

Had Adams taken an ordinarily active part in the corporate affairs he would have discovered that the corporation's treasurer was engaged in the practice of embezzling from the company's funds. The shareholders demanded of the directors that they take action against the treasurer, but the treasurer, being a relative of Clay's the directors refused.

Blake, knowing that the directors had just completed a transaction which would be highly profitable to the corporation, bought the stock of Smith, a shareholder. Blake was not asked about nor did he reveal anything concerning the corporation's affairs. The stock was actually worth twice the amount which Blake paid for it and for which it was selling on the open market.

(1) If loss resulted from the contract which the directors made against the wishes of the shareholders and their advisory committee, would the directors be liable?

(2) Do the shareholders have any way to redress in a civil action the wrong committed by the treasurer? Discuss.

(3) Would Adams be liable for the loss caused the corporation by the treasurer's embezzlement?

(4) Does Smith have a right to avoid the purchase of stock by Blake?

Answer No. 10.

In a corporate structure the directors have specific duties which they, alone, are required to observe and under which they function. Among these duties are the exercise, by the directors of discretionary powers. While stockholders may advise the directors, and as they did in this case elect a committee; still they cannot displace the discretion of the directors nor the legal authority under which the directors operate.

The directors in their functioning may, and as a matter of pragmatism, often do commit error. Errors of judgment alone, do not render the directors liable. If the directors were solely guided by shareholder's committees they would be liable if they attempted to delegate their discretion as the law places this responsibility on the directors alone.

The proper course for the stockholders who distrust the ability of the directors is to replace the directors.

As the contract was "reasonably appropriate for corporate purposes" the directors properly exercised their discretion, which is nondelegable; and they cannot be held liable for any loss which might have resulted from the execution of the contract.

(2) The duty of Adams, as a director, required that he give his time and attention to the affairs of the corporation. He could not do this by acting in a perfunctory manner. Had he functioned in the way required by law he must have discovered the defalcations of the treasurer. The Constitution of the State of California for many years embraced a clause requiring that directors of corporations be liable for the embezzling by an employee or officer and similar breaches of trust.

This provision was only affirmatory of the common law in instances where the directors knew, or from the circumstances should have known of the defalcations.

The refusal or failure of the directors to take action in the matter of the treasurer at the demand of the shareholders certainly made the directors, including Adams, liable for the amount lost to the corporation thru the embezzling.

The shareholders may bring an action against the directors.

(3) Yes, explained in "2" above.

(4) The relation of a director concerning the affairs of the corporation and the affairs of a stockholder and the corporation are fiduciary. The law imposes upon the director the duty of acting with the utmost good faith in all such matters. The director may not remain quiescent concerning a secret profit he may have made when the source of knowledge comes to him thru his functioning as a director of the corporation. The director may not tacitly engage in profitable operations for himself when such operations conflict with any duty he owes to the corporation as an artificial entity, or to the stockholders as persons in whose behalf the director functions.

Had the corporation purchased the stock of Smith at the price which Blake paid, it is obvious that the corporation would have enjoyed the same profit, on resale, or would have reduced the outstanding stock. In either event it would have been highly advantageous to the corporation.

Blake in using knowledge which came to him as a director engaged in an operation which conflicted with his duties in his fiduciary relations.

Question No. 11.

In a personal injury action brought by Phillips against Dodge, Adams, an attorney for the plaintiff, is permitted, over defense objection, to take the stand and testify he saw the defendant shortly before the collision in a drunken condition. The defense, on cross-examination of Adams, is allowed to ask, over the objection of associate counsel for the plaintiff, whether Adams had not taken the case on a contingent fee basis. The court further rules, over plaintiff's objection, that the defense may ask Adams if Phillips had not been drunk when Adams, an hour after the collision, was called to the jail in which Phillips was incarcerated, and also whether Phillips at such consultation had not admitted that he had been intoxicated.

The court also overrules a defense objection to Adams calling one of the jurors, who thereupon testifies to overhearing Dodge say he had been intoxicated at the time of the injury to Phillips.

After judgment for the defendant the plaintiff moves for a new trial on the ground, among others, that one of the jurors had accepted a bribe for the defendant. At the hearing on the motion the court, over the defendant's objection, admits an affidavit from one of the jurors that the juror in question had received a bribe.

Discuss the correctness of the court's ruling in each instance.

Answer No. 11.

An attorney may be witness for his client. This is frowned upon as a matter of ethics and it should not be done but it may be done.

When an attorney does become a witness his bias or partiality may be shown, as in the instance of any other witness. How better may the bias of a witness be shown than by proving that he has a financial interest in the outcome of the litigation contingent upon its terminating favorably for the party for whom he testified?

Adams should be compelled to testify as to whether he took the case on a contingency.

An attorney, under our code, may not testify to confidential communications received in the scope of his professional duties, without the consent of his client.

The condition of intoxication is not a confidential communication. Anyone may testify as to that matter. An attorney is not exempted from testifying as to all matters coming under his observation while acting within professional scope. (*Sharon* v. *Sharon*, 97 Cal.)

The appearance of the client at the time of the interview, his gait and other matters indicating intoxication may be inquired into and the opinion of the attorney as to intoxication elicited.

However, we cannot compel Adams to testify as to the admission of the client. The law presumes that such a discussion was a confidential communication and comes under the rule of privilege. It appears, from the text of the question that only the attorney, Adams, and the client were present on this occasion, so we cannot inquire as to the admission.

A juror, or the judge, may be called as witnesses in any cause in which they may give admissible evidence. The evidence was a statement against interest on the part of a defendant and comes under section 1870, subd. 2; being "an act, declaration or omission against interest." Under the historic development of our law the jurors are competent as witnesses. In fact in the early history of litigation in England they were the "compurgators" who testified freely concerning the issues.

One of the grounds for a new trial, under our Code of Civil Procedure, is the bribery of a juror and the section specifically provides that the affidavit of a juror may be used for proving the misconduct of the jury in an instance of this kind.

BOOK VII.

Question No. 12. Grade 25.
Question No. 13. Grade 50.

Question No. 12.

Abbott, a famous painter of biblical characters, advertised publicly that he intended painting a life size picture of Elijah and solicited bids for its purchase. Byers' offer of $750 being the highest of several received, Abbott agreed orally with Byers that he would paint the picture and sell

it to Byers for that price. He completed the painting and advised Byers it was ready; whereupon Byers, in a personal letter to his wife, mentioned, among other things, that ''I have bought a picture from Abbott for $750''. The letter was read by Mrs. Byers and some mutual friends of hers and Abbott's and destroyed.

Later, Byers wrote Abbott as follows: ''I will pay $200 for a life-size painting of Moses,'' and the next day he wrote: ''I will pay $200 for a life-size painting of Joshua.'' Abbott, without notifying Byers, commenced work on both pictures. Hearing from a friend that Abbott was working on the painting of Moses, Byers, without the knowledge of Abbott, contracted to sell it to a customer for $300. When both pictures were one-half completed, Abbott notified Byers of this fact and that he had decided not to finish the painting of Moses, but would finish that of Joshua forthwith. Byers immediately advised Abbott that he had had no idea Abbott had commenced on the painting of Joshua, that he no longer wanted it, that Abbott should consider this offer revoked, but that he would hold Abbott for breach of contract unless the painting of Moses was finished. Abbott completed the picture of Joshua but not that of Moses. Byers now refuses to pay for the painting of Elijah and refused Abbott's tender of that of Joshua.

1. Can Abbott recover for Byers' refusal to accept and pay for the painting of Elijah?

2. Does Abbott have a cause of action for Byers' refusal to accept tender of the painting of Joshua?

3. Does Byers have a cause of action for Abbott's refusal to complete and deliver the painting of Moses?

Answer No. 12.

(1) Our Statute of Frauds does not enter into the matter (sec. 1973 C. C. P.) for the reason that a painting in the process of completion, or to be painted, comes under the excepted classification.

The ad of Abbott was an offer which was accepted by Byers, as the high bidder. The latter was not required to be communicated to Abbott for the reason that this matter is outside the Statute of Frauds, being a class which was to have been created within the meaning of the Statute. As each picture was distinctive and unique.

(2) Byers makes two distinctive offers concerning different subject matters at different times. While an offer should be

accepted the parties may by their course of dealing establish what our Supreme Court of California denominates "contemporaneous construction of a contract by the parties." The course of dealing shows that Byers made an offer and then assuming the acceptance by Abbott Byers then offered the subject matter for sale. Abbott, relying upon this offer of Byers, commenced the work of artistic production.

Abbott has a cause of action for the failure of Byers to accept the picture of Joshua. The orders for the pictures were separate transactions concerning different subjects and the contracts were individual matters. The offers having been communicated at different times we have two distinct contracts.

(3) Abbott by commencing work on the picture of Moses established the contemporaneous construction and his act was an acceptance of the offer of Byers. Byers offering the picture for sale to a customer confirmed the contemporaneous construction. The artist apparently refused to finish the picture because he had heard of the profit which Byers expected to enjoy from the transaction but as he had commenced the picture, a contract exists.

Byers has a cause of action against Abbott.

Question No. 13.

Intending to make a will, Wilson typed a one-page document entitled "Last Will". It contained the usual formal clauses and read in part: "Such articles as I shall designate in an inventory that will be found pinned to this will, I leave to Jones." Following various dispositive clauses, one of which named Smith as a legatee, there was a space with three lines for signatures, and, following this, a residuary clause.

Wilson called in Smith and his stenographer. He signed on the first line in their joint presence, stated it was his will, and requested them to sign on the lines as witnesses. Smith signed and left the room, and twenty minutes later the stenographer signed. Wilson remained present throughout.

Two weeks later Wilson listed on a paper entitled "For Jones" several articles, none of which was otherwise specifically disposed of in the original document, pinned the list to the letter, and placed both in the envelope. A year later Wilson executed a document entitled "Codicil" which clearly referred to the original instrument as his will and appointed a different executor to act thereunder. This document, wit-

nessed by Allen and Brown, was duly executed by Wilson in compliance with all local statutory requirements. Wilson placed it in the envelope and a month later died.

(1) Was the original document, prior to execution of the codicil, validly executed as a will?

(2) Assuming that the original instrument and the codicil were validly executed as a will, what are the rights of (a) Jones, (b) Smith?

Answer No. 13.

(1) Our Code provision requires that the testator sign the will in the presence of the witness and the witnesses must sign in the presence of each other. As Smith left the room before the signature of the stenographer as a witness the will was not properly witnessed.

The residuary clause followed the signature and must have been below them and as to this clause it was not "subscribed", which our Code requires in a will of this class. As "subscribed" means to be written below the residuary clause does not satisfy the requirements of the Code.

Smith was a legatee and also a witness.

(2) Assuming the validity of the will:

(a) There was no testamentary disposition as to the articles to be left to Jones at the time of the making of the will because the testator did not at that time have in mind the things that Jones was to have under the will. While a testamentary clause may refer to other documents or to an inventory then in existence, or contemporaneous with the will; the testator cannot at some future time make testamentary disposition by selecting or inventorying the objects. At the later time he may lack testamentary capacity.

(b) Smith was a witness under the will and cannot, for that reason, take under it.

## BOOK VIII.
Question No. 14. Grade ——.

## BOOK IX.
Question No. 15. Grade 20.
Question No. 16. Grade 35.

Question No. 15.

The City of Fairview was repairing some sidewalks. Doss, a supervisor of streets, was directed to do the work as part

of his regular employment for the city. He piled bricks and stones between one of the walks that was to be repaired and the curb of the street. The pile was very high, insecure, and overhung the curb, but probably would not fall unless touched. The City of Fairview had an ordinance forbidding the riding of bicycles on the sidewalks.

Tommy Parker, five and a half years old, had received a bicycle as a birthday present from his father and had been told not to ride in the street. Mr. Parker wanted some cigarettes and told Tommy to get them at a store around the corner on the same block. In going Tommy would have to pass the pile of bricks, as Mr. Parker knew. Tommy's father said: "Don't ride in the streets. Stay on the sidewalk." As Tommy, on his bicycle, was passing the bricks, one Daniel, driving carefully, ran into the bricks because of a blowout resulting from a nail penetrating a tire. He struck the bricks lightly, but hard enough to cause a few of them to fall from the top of the pile. Tommy was struck and injured by them.

What action or actions, if any, lie in favor of Tommy? Discuss all points suggested by the facts.

Answer No. 15.

Ordinarily a Municipal corporation is not liable for the acts of its employees which result in tortious injuries.

There are exceptions to this rule, one of them being the instance where the employee is an actor in a series of events which result in damage while the employee is acting within the scope of his duties in some proprietary act of the municipality.

In the repair of streets an employee acts for the proprietary benefit of the city, his employer.

The ordinance of the City of Fairview which proscribed the riding of bicycles does not, in itself, preclude recovery as our courts have held that the act which is forbidden by ordinance must have been the basis of the Plaintiff's injury to preclude recovery.

If in the violation of an ordinance of this kind, the Plaintiff necessarily places himself in a position of danger or harm from which injury directly flows, the violation then bars recovery.

Neither the minority or tender years of Tommy nor the instructions of his father are material to a discussion of the matter.

The ordinance as enacted was a proper and lawful exercise of the Police Power of the city as it directly concerned the safety and welfare of the people. Courts have held that a city could validly pass such an ordinance, restricting the use of bicycles to the streets and prohibiting them on walks.

The negligence of Tommy's father in sending the boy for the cigarettes cannot be imputed to the son.

Daniel in the maneuvering of his car, following the blowout was the causative factor in the injury.

Under these circumstances the courts endeavor to determine the proximate cause of the injury.

As the injury was caused by the toppling of the bricks, and this in turn was caused by the collision from Daniel's car; the proximate cause of the injury was the collision.

If Daniel were not negligent in the management of his car Tommy cannot recover.

The circumstance of Daniel's car veering from the street into the brick pile was the result of unfortuitous acts beyond the control of Daniel.

Daniel could not anticipate that his tire would "Pick up" a nail and blow out at the very point and at the very time that Tommy would be riding by the brick pile.

The proximate cause of the injury being the defection of Daniel's car and that being beyond his control to rectify or avoid; Tommy cannot recover.

Question No. 16.

Jonas owned in the State of Magenta a number of stores engaged in the retailing of bread. Competition in the field became so ruthless as to threaten to destroy the price structure upon which the grain growers depended for their livelihood and the community for its bread supply. Production of grain and distribution of bread is a paramount industry of the state.

There are employed in the harvesting of grain large numbers of Japanese toward whom considerable hostility developed. Labor conditions became demoralized.

In view of these conditions, the State of Magenta passed three laws, as follows:

(1) A law providing for a bread control board with power, in accordance with a standard laid down in the statute, to fix minimum and maximum retail prices for bread. The court fixed 9¢ per loaf as the price. Jonas, however, continued to sell bread for 8¢ per loaf. Can he be convicted under the statute?

(2) Making it a misdemeanor for an employer to exact as a condition of securing employment a promise from an employee not to join a labor union. Jonas required such promises from his employees. Can he be convicted under the statute?

(3) Providing that Japanese should be required to attend schools established separately from schools for Whites and classifying anyone with more than one-fifth Japanese blood as being a Japanese within the meaning of the statute. A student with one-fourth Japanese blood attacks the statute. Is it constitutional?

Answer No. 16.

(1) A decade ago most courts would have held that the statute fixing the price of bread interfered with the freedom of contract and for that reason it would have been held to have been an unconstitutional statute.

Questions of constitutional law are not only vexing to the harried law student attempting to write on these great questions in the hurry of the moment but have proven perplexing to the courts themselves.

A compilation of decisions of the Supreme Court of the United States for the past term would have shown that of appeals from the U. S. Circuit Courts, 45 decisions construing the constitution were reversed and 35 were affirmed.

A further study would show that 93 dissenting opinions were given during the term and that in one case 5 different opinions were given by as many different justices concurring but on entirely different grounds.

Additional statistical study would show that the number of dissenting opinions increase from the period, progressively, from 1933 to date.

The exercise of the power to fix bread prices must be justified in the Police Power of the State but if we were

to apply the reasoning of the U. S. Supreme Court in the case of *U. S.* v. *Rock Royal Corp. Inc.*, recently decided under the commerce power of the U. S., if we were to apply the decisions of the judges and their reasoning to the state of facts embraced in the question; we must arrive at the constitutionality of the statute.

The constitutional doctrine has undergone many changes in the past year. It is in a state of flux, if not radical revolution; considering the law as we thought we knew it.

It might be argued that bread being the very staff of life, to employ a cliche, is bound up with the health and welfare of the people.

It might also be argued, as the U. S. Supreme Court did in the case cited, that bread (like milk) is vital to the very being of the community and that if it were unregulated chaos would result. Prices would tumble at one period and skyrocket at another.

We might say that the gyrations of prices would be uneconomic and that price stabilization is necessary to the furnishing of a reliable supply of the staff of life.

The doctrine of price fixing is novel to the law of the United States of America. It was given impetus in the N. R. A. campaign and had at various times been advocated as the only course to relieve widespread unemployment and uneconomic conditions.

The effort by courts to sustain measures of the kind here under discussion must result in and emanate from some belief in the judges that supply and demand can be and should be regulated. This is not a province of law, if it were possible of fulfillment.

There is nothing in the statute which in any way concerns the health and welfare of the people of "Magenta" and there is much in the measure that interferes with the freedom of contract.

The Constitution of the United States became the organic law of the land in 1788, on the ratification of the document by the State of New Hampshire; it being the ninth state to ratify, under the terms of the Constitution.

The provisions of that great document are substantially that of our various State Constitutions which embodied or

copied the controlling provisions of the Constitution of the United States.

The provisions of our State Constitutions reflect the wisdom of men of affairs, made wise in the hard school of experience.

It is said, in behalf of measures similar to the one under discussion that we are in a new order of things and that we must progress. The advance in industry and science are cited and the efforts of other countries to achieve regulation by statute or bureau are held up as exemplary methods of governmental procedure and control.

Granting that we are living [in] a rapidly changing age there are certain things which are basic in the scheme of things. '

Thomas Jefferson said, as nearly as can be recalled, in discussing the sphere of government, "If we are to be told when to sow and when to reap." He then related the difficulties attendant to that sort of thing.

The State which attempts to embark on legislative price fixing, or to organize bureaus, delegating to them the authority to do so will inevitably find itself in conflict with the multiplication table!

The fixing of prices is an unconstitutional exercise of power and as the bread control board acted beyond the pale of constitutional functioning; Jones should not be convicted.

(2) Formerly it was held that an employer might require of a prospective employee that he should not be a member of a labor union, nor join a union. Since the N. R. A. campaign there has been a great reversal of opinion on that subject. It will be recalled that the famous section "7A" of the National Recovery Act provided that there be no discrimination. It provided that an employee might join and belong to any labor organization of his own choosing, or none if he so pleased.

If an employer could require an employee to refrain from joining a labor union the employee could in turn require the employer not to join any employers association or group.

Is freedom of contract affected by the Statute? The employer, if he could exact a promise from the employee of the nature mentioned could restrict the employee in his subsequent status.

Most of our courts have held in passing on these questions that industrial advance, the aggregation of great capital and the almost uniform adherence by employers to employers groups and associations make it necessary that the employee be unrestricted in his status as a member or nonmember, of any labor organization. Jones could be convicted.

(3) Conditions may exist where scholars in a neighborhood may be so predominately of a racial group in number that the efficient and proper course of education might require that a certain school should be attended only by a certain racial group but to be reciprocal it would have to be provided that no other classification of scholars, or pupils, could attend such school.

The classification and method of determination of the racial group would have to be reasonable and based on scientific or ethnological factors.

The Statute under consideration provides that a person having more than one-fifth Japanese blood is a Japanese within the meaning of the statute. This is not only an arbitrary but an illogical and paradoxical method of determining racial extraction. The criterion of determination under the Statute is a way of saying that the lesser is as great as the whole. This evaluation violates the dictates of common sense and what is not common sense is rarely good law.

There may be educational merit in the separation of races. Courts could take judicial notice if the *lex loci* were Los Angeles, instead of Magenta, that in the Japanese district of the City of Los Angeles there are more than 55 thousand Japanese, racially speaking. If the State of Magenta, embraced within its boundaries a similar subdivision the Courts of Magenta might also judiciously notice; it being a matter of widespread knowledge that the public schools in the Japanese district, at least in the primary grade, were overwhelmingly composed of those Japanese descent.

The court might under the same circumstances also judiciously know that it is common practice among Japanese parents to place their offspring in Japanese Kindergartens where they are taught by native Japanese teachers in the Japanese language. In these private schools the children of tender years are taught only the Japanese language and culture. They learn the ''Kata-Kana'', a simplified Japanese

alphabet of some 75 characters, as distinguished from the "Kanjai", the conventional language of Japan; expressed by the calligraphy borrowed from the Chinese.

Thus, the court of Magenta might indicate their realization of the situation that the legislators might have had in mind, in their attempt to establish a racial school.

Probably legislation which did not conflict with the constitutional restrictions regarding race and religion might be drafted but the determination of racial character in the method employed by the legislators of Magenta is racial discrimination and conflicts with the constitutional guarantees against laws which are restrictive under the conventional language invariably utilized in State Constitutions.

## BOOK X.
Question No. 17.   Grade 50.
Question No. 18.   Grade 20.

Question No. 17.

John Jones and Mary Smith married in 1935, and have ever since resided in California.   From his salary as a store executive during 1936, Jones in 1937 purchased Blackacre, the conveyance thereof being taken in the name of "John Jones and Mary Jones, grantees."   In 1938 Jones, also from his salary, purchased Greenacre, the deed to which with the consent of his wife, named the grantees as "John Jones and Mary Jones, as joint tenants."

Shortly after his marriage in 1935, Jones took out a policy of insurance on his life, naming his mother as beneficiary, and has paid all premiums thereon from community funds, without the consent of his wife.

Jones now being seriously ill, his wife asks your advice, based on the facts stated, as to:

(1)  Their respective interests in Blackacre.

(2)  Their respective interests in Greenacre.

(3)  Her rights in the proceeds of the insurance policy in the event of Jones' death.

Answer No. 17.

(1)  The earnings of the husband during marriage are community property.   The subject matter purchased with such earning is also community unless the parties by some act change the nature of the property.

Jones having purchased Blackacre with community funds and the deed having been made to him and his wife in the conventional manner, this parcel is community property.

The husband during the marriage has the right of management of community property.

As Jones is seriously ill we must assume that Mary inquires as to the possible effect of her property interests in the event of her husband's demise.

As no will is mentioned we must assume that none exists and as no children are mentioned the property which is community, being Blackacre, would go to Mary under our code.

(2) Joint Tenancy is a distinct and peculiar estate in the eye of the law. There exists unity of time, title and interest. On the death of a joint tenant, the estate goes to the surviving joint tenant, or tenants. The joint tenants having unity of time, title and interest, they have equal and indivisible rights to management, occupancy and control.

By the terms of the deed under which the parties here held title the estate in joint tenancy is created. While the earnings of the husband in the absence of the deed to him and his wife, in joint tenancy, would otherwise have been community property, the parties in this case have, by taking under the deed, created an estate in joint tenancy.

Mary has a co-equal estate with her husband in joint tenancy during her lifetime and if he should die the entire estate of Greenacre becomes hers by operation of law.

(3) The insurance policy having been maintained and having been executed during the marriage, the payments being made with community funds, is likewise community property, even though the beneficiary is John's mother. As Mary never acquiesced in the payments made under the policy she should avoid the expense of litigation and clarify the matter by asking her husband to change the policy or make some congenial arrangement. In the event of John's death without such policy change litigation would be necessary to establish the nature of the insurance estate.

Question No. 18.

B purchased from S, a retail tobacco merchant, a box of nationally advertised cigars manufactured by M, B having designated that particular brand as his choice. B told S that he was having a party that evening and wanted to be sure

the cigars were fresh. That evening when B opened the box by breaking the seal, he discovered that each cigar was carefully wrapped and sealed in cellophane. While B was smoking one of the cigars it exploded and burned a hole in B's coat. Almost simultaneously, P, a guest, had the same thing happen to his cigar which had also come out of the same box. P's eye was so badly injured that it was necessary to remove it by surgical operation. The remaining cigars in the box were excellent in every respect. Neither S nor M had been negligent.

B and P come to you to see whether they have remedies against S or M or both. What you would tell them? Discuss.

Answer No. 18.

It is generally held that a retailer is not liable for a substance sold by him in an instance where the defect is so concealed and he would have no way of knowing of it and where he purchased the goods in the ordinary channels of trade. There are some exceptions to these decisions in the case of foods served by restaurants but ordinarily the law does not give an action against the retailer of so-called package goods for any damage done by a concealed defect or vice.

It is obvious that the explosions were due to some bit of cellophane, which in some way became concealed in the cigars. How this could happen without negligence on the part of ''M'' is not disclosed by the question. The wrapping of the cigars in cellophane is a part of the fabrication of the complete box of cigars in the plant of ''M''. While it is difficult to conceive of circumstances wherein a foreign element such as cellophane is concealed with the wrapper of a cigar without negligence in the manufacturing process; yet the question must be discussed as it stands.

It is generally known that cellophane, being a cellulose product, may be highly inflammable and when compressed, explosive.

A manufacturer who utilizes this substance must at his peril see that none of it could be concealed within such an article as a cigar, which in the process of consumption is subjected to heat and fire.

Discussing the question on the basis that the manufacturer, ''M'', had utilized the highest degree of care in the manufacture of the cigars, yet the facts of the case clearly demonstrate that some cellophane was concealed within the cigars

and the fact that other or all cigars in the box were perfect does not alter the case.

It is not beyond the realm of possibility that the only two cigars in the box that were dangerous were chosen by the guests or that chance determined this happening.

One who utilizes cellophane of the explosive character used in this matter is "playing with dynamite" considering the effect of heat and fire and "M" is liable.

## BOOK XII.
Question No. 20.   Grade 20.
Question No. 21.   Grade 40.

Question No. 20.

In January, 1938, the Seaside Realty Company, to promote the sale of lots in a subdivision, entered into a written contract with one Wing, a nationally known aviator and stunt flyer, in which Wing, in return for a salary of $500 per month, agreed to make exhibition flights over the property for one year, and to perform exclusively for the Seaside Company during this period.

At the same time Wing also entered into another written contract with the Seaside Company in which he agreed to purchase a lot for $1,000 payable in monthly installments of $100 beginning March 1, 1938, the land to be conveyed upon the payment of the final installment. The contract provided that the installments were to be paid upon the first day of every month; that time was of the essence and that non-payment of any installments when due would forfeit all payments previously made.

The installments were paid promptly until September 1938 when Wing neglected to tender payment until September third. This was accepted as were the next two installments, which were both tendered on November seventh. At that time, however, the company notified Wing that future installments were payable promptly when due. Wing tendered the final installment December second, which tender was refused as was Wing's demand for conveyance of the lot.

Wing, in the meantime, having secured a better offer from a competing company, is preparing to fly for it. The Seaside Company seeks your advise in regard to:

(1) Securing an injunction to prevent Wing from performing for the rival company.

(2) A suit instituted by Wing to enforce the specific performance of the contract of sale.

(3) The right of Wing to recover the money paid on the purchase price, if he cannot secure specific performance.

Answer No. 20.

(1) The courts have uniformly held that services which were unique in their rendition may be the subject of equitable relief where a contracting party rendering such services attempts to breach the contract. The leading case on this subject, *Lumely* vs. *Wagner*, involved the services of an opera singer and most of the cases are concerned with the performance of histrionic or artistic talent but the courts, in many instances, have enjoined business executives who possessed unusual and distinctive ability, at the instance of their employers, from becoming the employee of another.

The employee cannot be compelled to continue work but he may be enjoined from entering the service of another or engaging in service.

The services need not be unique, they may only be unusual or distinctive.

The services for which Wing engaged himself were distinctive as he had acquired a national reputation as a stunt flyer. The purpose of the Seaside Realty Company was to exploit their property by an attraction which would lure prospective purchasers to the site.

Were the services rendered and to be rendered by Wing less unusual or distinctive than those of the average movie star? A stunt flyer engages in an occupation in which there is a high degree of mortality. There is not much future in that vocation. Such men must not only practice for years to control their planes in their gyrations but they must be exceptionally endowed physically, mentally and nervously with most unusual qualifications. Vision must be perfect and a high degree of mental and physical coordination is required.

The various "stunts" consist of complicated maneuvers such as "wing overs", "Innelman Turns", "Whip-stalls" and other manipulations which require the highest degree of talent.

The average stunt flyer requires a higher degree of ability and mental and moral stamina, with unusual physical and

nervous attributes to perform his work, than does the average movie star.

As the offer from the rival company came to Wing and he is preparing to fly for it during the period of time for which he contracted to fly for the Seaside Realty Company, an injunction could be secured restraining Wing from so doing.

(2) It is a general rule of equity that specific performance lies to compel the transfer of realty under contract because each piece of land is unique. For this reason there is no remedy at law which is plain, speedy or adequate.

Our California Supreme Court, in a case similar to the one presented has held that where the parties to an installment contract accept installments when past due that the parties themselves have established a contemporaneous construction of the contract.

This is the law even tho' the contract contains a clause reciting that time is of the essence, as this one did in the question.

The courts of California, of general jurisdiction, such as the Superior Court have equitable jurisdiction. This is granted under the Constitution of the State of California. They have all the equitable jurisdiction exercised by the Chancery Courts of England. There is an academic question as to whether their jurisdiction, in the subject matter, is determined as of the time of the American Revolution or of the organization of the State as one of the States of the Union.

However, the practical question presented is to be determined by the rule that equity will compel specific performance of contracts for the purchase of land.

While the contracts of service and the contract to purchase were entered into by Wing at the same time they are to be considered as entirely separate and distinct agreements.

Neither has any bearing on the other.

It is an oftquoted maxim of chancery that "Equity abhors a forfeiture." Or "Equity abhors forfeitures."

Wing having paid all but the last installment would be subjected to a forfeiture and when we consider that the California Courts have observed the doctrine of contemporaneous construction and have given relief to those who substantially fulfilled their contracts; the tardiness of Wing, in a few instances was excused by the acceptance of his money by the Realty Company.

The Seaside Realty Company could not wait until the last payment and refuse to accept it; having condoned the previous instances of dilatory payment by accepting them.

Wing may compel specific performance.

(3) The same doctrine of contemporaneous construction discussed in the previous question applies here, and for the same reasons.

The jurisdiction of our California Courts is somewhat different than most of those of sister states in the Union.

Under our Code law and equity are wedded. When the Code was adopted in 1873 it was considered advantageous to give legal and equitable relief in the same action.

While it is unusual to hear a California attorney recite the equitable maxims in court and while too frequently according to Professor Pomeroy in his introduction to his monumental work on the subject of equity, the equitable powers of the courts are overlooked in this jurisdiction, yet our Superior Courts do have, and they are required under our Code to apply equitable and legal rights in an action.

This being true, as a matter of law, Wing could invoke in an action for damages all of the equitable rights, as distinguished from the equitable remedies, that he could invoke in the previous matter.

In other words the substantive law of equity is applied in a legal action but not the adjective law of equity.

Wing can sue in an action for money for breach of contract and his damages are measured by the profit on the lot sale, commission to the salesman, administrative expense on the transaction; and other proper charges which might be deducted from his demand.

Question No. 21.

Adams, through the fraud of Blake, was induced to give the latter a negotiable promissory note for $5,000, dated October 23, 1938, payable one year after date, in consideration of Blake conveying Blackacre to Adams.

Six months later Blake, without fraud, induced Adams, as yet unaware of Blake's prior fraud, to execute to Blake a mortgage on Blackacre securing payment of the note. No new consideration was given for the mortgage, it reciting that it was executed "as security for that certain obligation in the sum of $5,000 represented by a promissory note bear-

ing date of October 23, 1938.'' This mortgage was never recorded.

On October 21, 1939, Clay, who was unaware of the Adams-Blake mortgage, secured against Adams a judgment for $10,-000, an abstract of which he immediately recorded in the county where Blackacre was situated, which by statute created a lien.

On October 22, 1939, Blake surrendered the October 23, 1938, note to Adams in exchange for a new negotiable note due October 23, 1940. Adams still being unaware of Blake's prior fraud. No new mortgage was executed.

(1) Assuming Blake retains the new note and at the maturity thereof sues for foreclosure of the mortgage on Blackacre, discuss all points which a careful lawyer would consider as possible defenses for Adams.

(2) If Blake, prior to maturity of the second note, negotiated it to a holder in due course, could such holder at maturity foreclose the mortgage? If so, what would be the priority as between such holder and Clay?

Answer No. 21.

It would be advantageous in the discussion of this question to know the kind and extent of the fraud practiced.

It is difficult to conceive how Blake ''without fraud'' secured a mortgage from Adams; as the original transaction was tainted with fraud in its inception and certainly the securing of such an instrument as a mortgage would be, at lease, a continuation of the initial fraud.

There being no consideration for the execution of the mortgage that instrument is regarded as having been based upon a past consideration and between the original parties. The recitals of the instrument, altho' specific, do not control. The real consideration of the instrument may always be shown.

Before the execution of the mortgage there was in existence only the note.

''Fraud vitiates everything.'' As the original transaction was conceived and executed in fraud, Adams may defend on that ground. The execution of the new note does not alter the situation as Adams was unaware of Blake's prior fraud. Under our Code one may sue for fraud within three years after the *discovery* of the fraud. (338 CCP.)

Certainly one could defend on the ground of fraud and there has been no laches nor estoppel in the making of the new note because the maker, Adams, did not know of the fraud.

A very practical question arises as to the value of the property involved.

In defending Adams may take the position of fraud in the original transaction, not discovered by him at the time of execution of the various documents involved.

No consideration for the making of the mortgage.

No new mortgage was executed at the time of the execution of the new note.

No action lies for foreclosure for the reason that the old note was extinguished by the new one and the mortgage is not a security based upon the new note.

(2) An innocent purchaser for value would be regarded as having acquired the second note under the mortgage security and he would take free of all the equities existing between the parties. It follows that he could foreclose.

Clay having recorded the abstract of judgment and the mortgage not having been recorded, Clay has priority.

## BOOK XIII.

Question No. 22. Grade 30.
Question No. 23. Grade 55.

Question No. 22.

Jones owned and occupied a building adjoining a public highway in the City of Fairview, State of Magenta. He arranged with Green, an odd job man in the neighborhood, for the latter to clean the windows of the building at the rate of fifty cents per hour. As Jones knew, Green had caused two injuries during the past year while engaged in window cleaning through dropping tools on passersby.

An ordinance of the City of Fairview prohibited the use by window cleaners of any brush other than a special type so designed as to strap around the hand. Neither Green nor Jones had such a brush, however, and Jones told Green to use a short mop with which Jones supplied him.

Jones saw that Green was working without a safety belt but made no objection, although a city ordinance required such a belt to be used. He gave no direction or suggestions other than as stated above as to how Green should do the

work. While Green was cleaning one of the higher windows, he negligently slipped, and, due to not having a safety belt, was forced to grab the window sash with both hands, as a result of which the unattached mop fell striking and injuring Paulson, who was walking on the sidewalk in front of Jones' building.

Is Jones liable to Paulson? Discuss all possible bases upon which such liability might be predicated.

Answer No. 22.

As the contract of employment is on a time basis for wages, Green is an employee of Jones and not an independent contractor. Green, being an employee, came under the rule of *respondeat superior* as he is a servant of Jones in this undertaking.

We have a violation of two city ordinances here. Ordinances which are reasonable in their scope are proper objects of municipal legislation.

The violation of these ordinances in the acts in which the servant was engaged on behalf of his master, is the very cause of the injury.

The proximate cause of the injury was the failure of the servant to properly use a brush which could have been strapped to his hand, obviating injury by dropping to those below; and the failure to use a safety belt, which failure resulted in his efforts to observe the first law of nature and save himself.

Both of these proximate causes, or the division of the proximate cause into two parts, as you may prefer; was the causative factor in the injury and both had been proscribed by the city ordinance.

All of the ''possible bases'' would include:

a. common law liability under Master [and] Servant Doctrine. Relation and negligence established by statement of facts.

b. coupled with the violation of an ordinance prohibiting the act which was the proximate cause.

c. the violation of an additional ordinance, the act being an additional factor or contributing element in the injury.

Question No. 23.

John Smith, a wealthy real estate broker, by his will devised a small apartment house to Trask in trust for the use of Smith's son, Bob, for life, providing that Trask should

retain possession of the premises, manage all business transactions in respect thereto, and collect the rents, paying over the net income to Bob quarterly. The will further provided that Bob should have no right to anticipate such income by sale, assignment, mortgage, or in any other manner, and that such income should not be subject to the claims of Bob's creditors. On Smith's death, Trask qualified and entered upon the performance of the trust, his management producing a net income of some $3,000 annually. Bob, aged 22, and studying medicine, was able on account of his apparent affluence to secure almost unlimited credit, and was soon deeply in debt.

The apartment house being in need of replacement of some plumbing fixtures, the new installations were made by Plummer pursuant to a contract with Trask, the latter signing the contract in his own name, as trustee, of the estate of John Smith.

A janitor employed by Trask for the apartment house negligently left a broom on the stairs and Ransom, one of the tenants, fell over it and was injured.

What are the rights of (a) Bob's creditors; (b) Plummer, who has not been paid for his labor and materials; (c) Ransom, the injured tenant? (Do not discuss mechanic's liens.)

Answer No. 23.

Trask is the Trustee of an active, as distinguished from a passive trust. The courts have held that "Spendthrift Trusts" are valid where the trust created is not in its inception a device for defrauding creditors. As the period of time between the creation of the trust and it becoming effective thru' the death of Smith is sufficient to rebut any inference of that kind the trust is valid; with the proviso that the *cestui que trust* is deprived of control of the subject matter.

The decisions say that one cannot create a spendthrift trust and endow the beneficiary with any control over the subject matter to the extent that he may enjoy the increment of its earnings secure from his creditors and at any time control for his own benefit the subject matter of the trust.

The provisions of the trust in the question seem to have fully met all the requirements of the law in this regard.

(a) Bob's creditors cannot successfully attack the trust estate nor the income paid to Bob, with the proviso that after the income is paid to Bob that such income then becomes subject to execution, attachment or other appropriate remedy. Most decisions hold that the only instance in which money paid to a beneficiary may not be subject to legal process are [is] where the funds are paid under the protection of a statute which specifically exempts such funds from ordinary legal process.

(b) Plummer, having been engaged by the trustee may compel the estate to satisfy his claim by appropriate legal action. The subject matter of the estate is subject to claims for the improvement or preservation of the estate.

The circumstance of the trustee signing his own name, with descriptive words of representative capacity should not render the trustee personally liable for the amount of the plumber's claim.

The law was formerly different on this subject. The older decisions hold that if an agent sign his name instead of that of his principal the agent is bound but the modern trend is to exempt one who acts in a representative capacity from personal liability when the qualifying words appear with the signature, even tho' the words indicative of representation appear below the signature. If the text of the contract indicates an estate purpose, Trask is not liable.

(c) Tenants occupy premises subject to the general rule of contributory negligence, in any injury which they may sustain.

While the janitor was negligent in leaving the broom on the stairs the circumstances ordinarily would indicate the presence of the broom. Attendant circumstances may indicate negligence in an act of that kind; depending upon the amount of light available, the location of the broom on the stairs as to whether it was concealed in the juncture of the tread of the stair and the riser; the ability of the person injured and a multitude of other factors.

Ordinarily a broom on the stair is a conspicuous object and a tenant, or any other person, would in the act of ascent or descent observe the broom. If they failed to see it in the circumstances as outlined in the query; the law would impute to them contributory negligence and the negligence of the janitor would not permit the recovery.

166

BOOK XIV—blank.

BOOK XV.

Question No. 25. Grade 45.
Question No. 26. Grade 50.

Question No. 25.

On June 1st, Jones bought Blackacre and Whiteacre in the State of Magenta for $15,000 each, such being the reasonable value of the land. On June 15th he contracted in writing to sell Blackacre to Black for $12,000 payable as follows: $2,000 down and $5,000 on July 1st at which time the deed was to be delivered "on execution and delivery of a purchase-money note and mortgage on Blackacre in the sum of $5,000. . . . " Black paid the $2,000 and on June 20th assigned his rights under the contract to Allen. On July 1st, Allen tendered Jones $5,000 in cash and his own note for $5,000 and offered to execute a purchase-money mortgage on Blackacre, but Jones declined the tender, claiming he had made a "bad bargain" with Black.

Meanwhile, Jones had leased Whiteacre to White for five years. A dyke had been erected on Whiteacre to prevent water on Whiteacre from running over into Greenacre, adjoining farm land owned by Jones. The dyke was in disrepair and leaked, damaging crops on Greenacre, and the lease provided that White was to repair it within two weeks. After White had taken possession, a separate contract was entered into whereby Jones agreed, for adequate consideration, to install on Whiteacre a system of pipes for irrigation. White failed to repair the dyke as agreed, and Jones has failed to install the irrigation system.

(1) Can Allen compel specific performance of Jones' promise to convey Blackacre?

(2) Can Jones compel specific performance of White's agreement to repair the dyke?

(3) Can White compel specific performance of Jones' agreement to install the irrigation system?

Answer No. 25.

(1) Contracts in which personal skill or the credit or probity or personal qualification of a contracting party are involved are not assignable.

Contracts which embody a clause prohibiting assignment are likewise not assignable.

As the contract under question involves none of these features [it] is of an assignable nature.

Allen tendered the money required to be paid and offered to execute the purchase money mortgage so it is apparent that the vendor relied upon the mortgage for security rather than personal credit of the vendee.

The courts grant specific performance of land contracts as each parcel of land is unique and the purchaser has for that reason no "plain, speedy nor adequate remedy at law."

Allen can compel specific performance.

(2) As specific performance is purely equitable in origin and application one who invokes the remedy and who has failed to carry out his agreements with the Deft. may be challenged with the equitable maxim, "He who seeks equity must do equity."

While the subject matter of the dyke and the irrigation are not directly concerned with each other, it is well settled that in equity when jurisdiction is taken concerning one justiciable question between the parties it is assumed for all matters that may be adjudicated, whether they are equitable or legal.

In a previous paper the jurisdiction of our Superior and Appellate Courts in equity was ascribed to the provisions of the State of California constitution and the codes made in pursuance of that jurisdiction and to save time and space, this matter will not be set out at length.

One of the grounds of equitable jurisdiction is the prevention of a multiplicity of legal actions.

If Jones were required to sue on the covenant requiring White to repair the dyke it follows as a logical sequence that such suits would be required to be filed and prosecuted as often as the water, due to natural causes, the terrain and other matters might accumulate and run over into Jones' land.

Pursuing this ratiocination, this would result in a multiplicity of legal actions.

Jones can compel specific performance.

(3) As was intimated in the previous question White could in a proceeding by Jones for specific performance, in the same action, compel performance. (By cross-complaint.)

For the purpose of discussion we will assume that Jones did not sue, as contemplated in the previous subdivision of this question.

If White could not compel specific performance he would be relegated to an action of law. Under the strictly legal situation he would be limited to the damage sustained by the failure of Jones to install the irrigation system, the interim being the elapsed time from the date of the contract for the installation of irrigation to the date of the suit. Damages could not be anticipated as they would depend upon climatic and meteorological conditions and other vagaries which would be impossible of ascertainment, or even surmise.

From time to time as damages would accrue during the period of the lease White would be compelled to repair to court. In a semi-arid country irrigation is necessary to most forms of husbandry and White to raise his crop, would be compelled to install some sort of irrigation system, mechanical or manual, as the case might be.

Under these circumstances equity would compel specific performance at the instance of White for the purpose of preventing a multiplicity of suits and for the reason that White had no plain, speedy nor adequate remedy at law; which is the basis of all equitable jurisdiction.

Question No. 26.

X, a logger, had been supplying logs for Y's sawmills for several years. On December 26, 1938, X received the following letter from Y: "Dear X. If you will promise to furnish all the No. 1 logs necessary to run my two Portsmouth mills for the coming year at $15 per thousand feet, the contract is yours. Please accept by return mail. (Signed) Y." Upon receiving the letter X replied immediately by telegram: "I accept your terms. Am towing the first raft to your booming grounds as we have done in the past and as is the usual custom. I would appreciate your depositing monthly checks to cover payment to my account at the Portsmouth Bank. (Signed) X." On February 1, 1939, X received the following letter from Y. "Dear X. In reply to your telegram of December 26, 1938, I regret to inform you that my lower mill was completely destroyed by the recent unprecedented flood, and that I have just concluded the sale of my upper mill. You may pick up your log raft at the booming grounds. (Signed) Y."

(1) Was a contract entered into between X and Y? Discuss fully. (Assume that no question arising under the statute of frauds is involved.)

(2) Assuming that X and Y entered into a binding contract, what is the effect of the sale of one mill and the destruction of the other?

Answer No. 26.

(1) Where a party makes an offer thru' a particular medium of communication and requires a reply thru' a particular medium, the use of a different medium in the transmission of the attempted acceptance does not meet the offer.

This [is] an artificial and technical rule of contractual law so the courts have held that the attempted acceptance may be refused on the ground that it did not meet the terms of the offer by failure to use the medium of communication as directed in the offer.

In this case the rejection of the acceptance was not placed upon the somewhat hypertechnical ground mentioned but upon a totally different ground, namely; impossibility of performance.

The text of the letter of ''Y'' proves that ''X'' had already moored his raft at the booming grounds when ''Y'' composed the letter.

This shows us that ''Y'' is attempting to revoke the contract upon the grounds stated in his letter.

A contract was entered into because ''X'' moored his raft at the booming grounds with the consent of ''Y'' who by his act in allowing this waived his right to reject the acceptance of ''X'' on the ground mentioned.

(2) It appears from the context of the telegraphic communication of ''X'' that ''X'' was well acquainted and fully conversant with the plan of operation under which ''Y'' functioned and operated as the telegram refers to what was done in the past and the usual custom of operations.

An essential element in the technique of the lumber industry is the use of a suitable saw mill at some appropriate point in the transportation of logs from the site of growth in the tree to the preliminary operation at the mill where ''logs'' become ''lumber.''

As a ''boomer'' X must have known this. Under this situation we must assume that the parties contracted with refer-

ence to the existence and the operations of the mills. Logs brought to the mill of ''Y'' would have small commercial value unless he could undertake their preliminary fabrication by sawing them.

We comprehend the law to be that where parties enter into contract concerning the fabrication of a particular subject matter and where the site of fabrication is destroyed by calamity, such as flood, that the performance of the contract becomes impossible to the extent that they regarded the site of fabrication as an element of the agreement.

To the extent that the mill destroyed by flood prevented the performance of contract, to that extent ''Y'' is released.

The sale of the other mill was the voluntary act of ''Y'' and does not excuse him from performance. To the extent that the upper mill might have functioned in receiving the logs which ''X'' might have furnished to it under the conditions contemplated by the parties at the time of the agreement; to that extent ''Y'' is not released.

As a matter of legal pragmatism in the ascertainment of damages resulting ''Y'' is liable to ''X'' for the profit on all the logs that ''X'' might have delivered to the upper mill; unless the capacity of the upper mill was less than the volume of the delivery of logs, in which case the measure of damages would be the capacity of the mill to consume the logs. (The contract was for the furnishing of ''all the No. 1 logs'' etc.)

BOOK XVI.

Question No. 27.   Grade 15.
Question No. 28.   Grade 25.

Question No. 27.

On February 10th A was the owner of record of a tract of vacant land in the State of Magenta. On February 10th A orally contracted to sell the land to B for the sum of $10,000. Pursuant to this contract A executed a deed to B and handed it to B with the oral direction that the deed was not to become operative until B paid the sum of $10,000 to A. B having failed to pay the $10,000 by April 10th, A executed a deed to C on that date and handed it to C with the following oral statement: ''Put this in your safe until I call for its return. If B doesn't pay me shortly, I may make a gift of the land to you.'' C disregarded this direction and had the deed recorded on April 12th. On April 13th B learned of

this fact and immediately had his deed recorded. On April 15th C executed a deed of this land to D in discharge of an antecedent debt due D. D accepted the deed in payment of the debt without knowledge of either B's deed or of the fact surrounding the execution of C's deed from A. D immediately recorded his deed. B has not paid A the $10,000.

Discuss the state of the legal title as between A, B, and D.

Answer No. 27.

As between A and B, the deed was not to become effective until the purchase price had been paid. The question presented hinges upon the operation of the Statute of Frauds, among other matters.

While partial performance may take a contract to sell realty "out of the statute" there must be more performance than is shown here, up to the time that B recorded his deed. By so doing B, who was entrusted with his deed demonstrated his intention of becoming the owner of the land. True he recorded the deed because he learned of the previous transaction but whatever motive prompted him; he did by this act take the matter out of the Statute.

In determining questions based upon the Statute it is sometimes helpful to recollect the purpose of the Statute and its history throws light on this doubtful and sometimes bewildering application of this universal bit of Anglo-Saxon legislation.

When the quaint "lawyer's latin" and Norman French in which the Statute is couched, is translated; the preamble assures us that it was devised to "prevent frauds and perjuries." The legal history of the day indicates that it did more to prevent the perjuries than the frauds.

In plain language the statute was designed to prevent doubt as to certain transactions therein enumerated. The doctrine of part performance was developed in instances where the acts of the parties clearly showed that there could be no legal doubt as to the intentions of the parties.

Applying this reasoning to the case the recordation of the deed by B would take the matter out of the statute. The deed then became a matter of public record and doubt resolved.

B is liable to A for the purchase price. A having made it impossible to give title to B because of his deed to C is

liable to B for breach of contract on the tender by B to A of the agreed consideration. The retention of B of the deed for the period in which he retained it without payment or tender of payment was lax, as was A, in not demanding the purchase money.

D was an innocent purchaser for value because the extinguishment of an antecedent debt is a good and valuable consideration and D took free of the equities existing between the various parties. The recordation of the deed by C made a good record title and his deed to D put title in D as it was the laxity of A in delivering a deed to C which resulted in the record title having been made.

D has title as against A and B.

Question No. 28.

For value then received, Jones executed and delivered to Smith the following instrument:

"Fairview, State of Magenta,
October 23, 1938.

I. O. U. or holder $5,000 on or before 30 days after dissolution of my partnership with James Brown. This note is secured by a mortgage on my ranch, Blackacre. If in the judgment of the holder said collateral depreciates in value, I agree to give when demanded additional security to the satisfaction of said holder; otherwise the holder shall have the option of declaring this note due at once.

(Signed) John Jones."

Is the above instrument a negotiable promissory note? Discuss all points involved.

Answer No. 28.

No. Our Uniform Negotiable Instruments Act, embraced in our Code requires that a negotiable instrument be made payable to BEARER OR TO ORDER.

Obviously the word "holder" does not meet the terms of the statute and the words, "or order" are not included.

The words "or order" are not needed when it is payable to bearer for the reason that the bearer may "order."

The initials "I O U" are not equivalent to a promise to pay. While these cryptic symbols are frequently used to denote a personal obligation or express an obligation in-

curred to the gaming table, so we are told, yet the courts have not extended their latitude to include a promise to pay.

The instrument is conditioned upon the judgment of the maker and a negotiable instrument may not be conditional. The agreement to give additional security is a contingency and the instrument may not be contingent in its terms and be negotiable. The option extended to the holder also destroys negotiability under the terms of the Act.

A promissory note cannot be made one by merely calling [it] that. It must contain the elements of negotiability. The time of payment is uncertain as the dissolution of partnership with Brown is uncertain.

In short all of the clauses save the reference to security destroy the ''negotiability'' of the instrument. This under the requirements of the Code.

## BOOK XVII.
### Question No. 29.   Grade 70.

Question No. 29.

Peters, a resident of California, has valid cause of action based on several contract claims against Adams, Blake and Crowley, respectively, none of whom has ever been in California. Blake is a resident of New York but owns an orchard in California. Crowley is a New York business man who has a branch office in California. Peters' claim against Crowley arose out of the business transacted by the latter in California through a local agent.

Advise Peters as to whether:

(1) He can secure a judgment in California capable of binding Adams' assets outside of California.

(2) He can subject Blake's orchard to the payment of the latter's obligation, and, if so, what procedure must be followed.

(3) The State of California has power to provide for personal jurisdiction over one in the position of Crowley.

Answer No. 29.

(1) Peters cannot for reasons that will be more fully discussed below.

(2) The celebrated case of *Pennoyer* v. *Neff* (95 U. S. 714 [24 L. Ed. 565]) is determinative of this matter.

A San Francisco lawyer sued Pennoyer in the State Court for a claim based upon the rendering of legal services. No service of process was obtained personally and the attorney published summons and secured what he thought was a judgment for the amount of his claim.

The defendant during the suit was without the State of California but returned and the Plaintiff attorney having sold property of the Deft. levied upon in execution to the Defendant in the Federal case the client of the Plaintiff attorney instituted proceedings to vacate the judgment and sale as conflicting with the due process of law clause of the 14th Amendment to the U. S. Constitution. Neff had bought the property on execution.

The Supreme Court of the United States held that the attempted jurisdiction thru publication of summons was not good.

If an attachment is issued in a suit based upon publication of summons the demand is good up to the amount of the fair value of the attached property. This is because an attachment is a proceeding *in rem* against the property itself and coupled with the published summons it gives the court jurisdiction to render judgment only in the amount mentioned, not the full amount of the plaintiff's demand, necessarily.

Now applying this rule of law to the case against Blake: An action may be brought in our courts based upon publication of summons and attachment against the orchard for the fair value of the attached property.

Blake may appear or default. If he defaults the judgment will be good up to the amount of the attachment.

The U. S. Supreme Court in reviewing the case cited held that service in the matter of an ordinary action at law must be obtained by personal service or the procedure outlined above.

(3) Yes. We have a code section providing that one who does business in the State of California must comply with the statute by indicating the person or agency upon whom service of process may be made. In compliance with the statute one appoints another within the State who is properly empowered to accept service of process in behalf of the person or agency without the State. This is an intra-state function; within the control of the State of California.''

[*This concludes the quoted material from the official questions submitted to and answers written by petitioner John E. Staley.*]

The record herein reveals no showing on the part of the respondents as to how or in what respect (if any) either or any of petitioner's answers to the foregoing questions was or were erroneous or defective, either in "analysis of the facts, . . . discussion of the legal problems involved", or "display of legal reasoning", as was required of petitioner—which requirements are hereinafter disclosed. Conclusively, as will appear from the face of each of the questions, petitioner's answers were simply graded in gross,—no indication being apparent regarding the several items which may have been credited in making up the total mark. I have not the time at my disposal to discuss herein either or any of such answers; but on a consideration of the same, to my mind, it is clear that as to each answer petitioner was accorded a credit that was much less than that to which he was reasonably and justly entitled. True, the "highly skilled . . . recent graduates of different law schools" were not of that opinion; but I submit to the bar of this state the proposition that, if its members will but cursorily examine the said questions and answers, although they may disagree with each of many of petitioner's statements as to the law, nevertheless they must conclude that, taken as a whole, petitioner's answers displayed a knowledge of the law and of the procedure of this state that may be deemed to be far in excess of that possessed by the average member of the bar,—with the consequence that, in fairness and justice to petitioner, he clearly should be entitled to practice law in all the courts of this state.

In addition to the said questions and answers, there is attached to the petition the following certificate, to wit:

"CERTIFICATE OF CHARLES E. McGINNIS, A. B.,
LL.B, D.C.L.

TO

"HONORABLE SUPREME COURT OF THE STATE OF CALIFORNIA.

"I, Charles E. McGinnis, hereby certify that I was formerly for five years a law editor and member of the regular Editorial Staff of the West Publishing Company, St. Paul, Minnesota,

and at such time one of the Editors of the American Digest and National Reporter System. That I later served as Professor of Law for about 16 years, in 4 schools, the University of North Dakota, Southwestern University, Metropolitan University, and Lincoln University where I was Dean of the School of Law for more [than] five years.

"That I am not now teaching or connected with any law school.

"That I was admitted to the bar of three States upon examination, Kansas, Colorado and California. That I was admitted to the Bar of the State of California on March 17, 1924 and ever since have been and now am duly qualified to practice in the Courts of this State.

"That I have examined carefully and in detail the questions propounded by the Board of Bar Examiners of the State of California to the Applicant, John E. Staley, and also his answers thereto as they appear herein, and it is my opinion that he is educationally qualified to practice law in the State of California and elsewhere, and that he is entitled upon this examination to admission to the Bar of this State.

"I have assigned to Answers to the numbered questions the following grades:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1. | 85% | 11. | 86 | 21. | 71 | | |
| 2. | 76 | 12. | 70 | 22. | 86 | | |
| 3. | 85 | 13. | 82 | 23. | 90 | | |
| 4. | 75 | 14. | —— Blank | 24. | —— Blank | | |
| 5. | 84 | 15. | 79 | 25. | 76 | | |
| 6. | 80 | 16. | 85% | 26. | 82 | | |
| 7. | 75 | 17. | 90 | 27. | 66 | | |
| 8. | 79 | 18. | 80 | 28. | 93 | | |
| 9. | 85 | 19. | —— Blank | 29. | 82 | | |
| 10. | 84 | 20. | 86 | | | | |

"This grading gives the Applicant, Petitioner, a total of 2121 points or percents, making his average well above the minimum passing grade. This average is 81 and 15/26ths per cent.

"I further certify that the Applicant, John E. Staley, has never at any time been a student under me, or in any school where and when I was engaged in instructing in law, and that I made his acquaintance for the first time within the present week.

"I further certify that I am now actively engaged in the Practice of Law in the Courts of this State and of the United States.

"Charles E. McGinnis.

"Dated: Los Angeles, California, July 27, 1940."

At the outset, on an inspection or examination of such questions and the respective answers thereto it may be noted that petitioner failed to answer three of the questions which were propounded by the board. As explained by the respondent board, such failure on the part of petitioner is due to the fact that "At recent examinations a total of twenty-nine questions have been given, of which, *through the use of options*, each applicant has been required to answer *twenty-six questions.*" (Emphasis added.)

The respondents' return to the order to show cause consists chiefly in a detailed explanation of the system which is employed by the board in preparing the questions proposed to be submitted to applicants for admission, as well as the method used in grading the respective answers of such applicants thereto. However, such answer of the respondents also contains several independent allegations of fact which appear to have some material bearing on the question submitted for consideration by this court. Among the other facts thus presented it may be noted that, at least in the first instance, if ever, neither any member of the board of governors of The State Bar, nor any member of its "committee of bar examiners" ever reads or grades the answers which theretofore have been made or given by any applicant for admission to practice; but it appears that in the first instance that arduous and all-important duty is delegated to at least fifteen *"recent graduates of a number of different law schools*, out-of-state, as well as California", and that to each such "reader" is assigned not more than two questions "in fields for which he is particularly equipped". However, notwithstanding the lack of practical experience of such "readers" in the practice of the law, by the respondents' answer herein it appears that "petitioner's answers to said examination questions were carefully, fully, and completely read and graded by a corps of *competent*, efficient, trained and *highly skilled* readers, particularly chosen for their ability to perform this special service". (Emphasis added.)

From the respondents' answer it also appears that, contained within the instructions which are given to the said "highly skilled readers" with respect to the grade which a given answer to a question may merit, is the following statement: "The analyses [*formulae*] are intended for the guidance of the readers, but they can properly serve that purpose only if it be constantly borne in mind that the applicants need not *duplicate* the completeness of statement found in the Committee analyses in order to be given a *perfect* mark. The scope of the analyses has been increased only so that an applicant who includes a discussion *which is not necessary* for *full* credit, but which, nevertheless, is relevant, *may be given a bonus.*" The "analyses" or *formulae* to which reference has been had are thus defined: "There is prepared for each question a *thorough analysis,* complete not only with statements of the *weight of authority* and minority rules for *each* legal problem, amply supported by the citation of pertinent authorities, but also with an exposition of the various views and approaches of different authorities, and including an application of the relevant rules to the particular facts." (Emphasis added.)

In the first place, it might be interesting to learn when, where, and under what particular circumstances the said "recent graduates of different law schools" were distinguished as "highly skilled"; and by whom they were originally declared so entitled? On a careful consideration of their work in the instant matter, it would seem just possible that they have not sustained their reputation. But that conclusion, of course, would be but a matter of opinion, regarding which experts (if any) as well as individual, common lawyers might differ, one from the other, or the others.

As may be noted, on the face of the respective answers here under consideration nothing appears that is indicative of any credit which was given to any item that properly was involved in the total credit,—the only showing being that 20, or 30, or 60, or some other per cent was accorded. Anyone who has had occasion to observe the grades which may have been given by different, independent, "non-expert" graders on examination questions will readily attest the statement that a difference of 25, 50 or 75 per cent may be, and frequently has been discovered. In the instant matter, that fact is illustrated by a comparison of the respective grades that were given by

the "highly skilled . . . recent graduates of different law schools" and those which were accorded by Mr. McGinnis. For example: by the former, to petitioner's answer given to question No. 1 he was awarded 45 per cent,—whereas by the latter he was credited with 85 per cent; on question No. 2 the "highly skilled" gentleman thought petitioner had earned a credit of 30 per cent, although Mr. McGinnis was of the opinion that 76 per cent was nearer the correct mark; on question No. 3 the respective marks were 35 and 85; and on No. 4 the grades were 30 by the one and 75 by the other. In such circumstances, it would seem impossible that any person, however learned, might accurately and with any assurance assert that any given answer was entitled to be rated as "perfect". But however difficult of solution the problem of grading such answers may be, unquestionably the announced conclusion would be more graciously received by an unsuccessful applicant, and more readily approved by the bar in general, if the fact were widespread and greatly publicized that the answers to the questions had been graded by long-experienced, liberal-minded lawyers of unquestioned ability and integrity, rather than by recent law graduates of whatever skill they might possess and however rightfully they might be entitled to the laurels which by someone had been accorded to them.

Remembering that the instant proceeding is before this court by reason of its issuance of an order directed to the *respondents* "to show cause why he [petitioner] should not be admitted to practice law in this state" (page 1 of majority opinion),—paragraph VII of the respondents' "Return to Alternative Writ of Mandate . . . " presents a point of considerable interest. Said paragraph is as follows: "The respondents allege that the records of the Committee of Bar Examiners show that this petitioner is *not qualified* for admission to practice law in this state *as indicated by the fact that he had taken eight examinations* since the year 1926, at *none* of which has he been successful, although each examination was determined on its own merits and in each instance all books remained anonymous during the grading period." (Emphasis added.) And clearly as implying emphasis to that point, in their brief herein the respondents again refer to petitioner's "record"—for the very apparent purpose of supplying a good reason for not making a recommendation to

the effect that petitioner be admitted to the practice of law within this state. Such reference in the respondents' brief is as follows, to wit: "The petitioner, John E. Staley, is a man 50 years of age. In June 1926 he first took a bar examination in California. He *failed* that examination. He *has subsequently failed* the examinations given in August 1927, August 1928, July 1929, April 1930, August 1930, February 1934, and October 1939. In each examination his papers were anonymous when graded. *He seeks admission to the bar of California despite this record.*" (Emphasis added.) And as though to clinch the fairness of the respondents' conclusion that petitioner was not nor ever could be entitled to practice law in this state, on the "fly leaf" of their brief herein the respondents include the following statement:

"QUESTION INVOLVED. *A person who has failed to pass eight examinations* given by the Committee of Bar Examiners seeks admission on a petition alleging his answers to the October 1939 examination were arbitrarily and capriciously graded but alleging no facts to substantiate such charge. . . . The petition for rehearing having been granted and an alternative writ of mandate issued the issue is: Does the petition state facts sufficient to entitle the petitioner to the relief prayed for?"

In other words, according to the pleading and the brief of the respondents,—irrespective of petitioner's integrity and his ability as illustrated by his respective answers to the several questions which were propounded to him,—the asserted fact that on each of seven previous examinations petitioner failed to be accredited a passing grade constitutes its real *cause*, and in and of itself presents a good and sufficient reason for a recommendation by the board of bar governors that in the instant matter the petition for admission to practice law in this state should be peremptorily denied. Basically, such a suggestion or conclusion is manifestly unfair and unjust.

However, in apparent contradiction of such conclusion, in another connection in the respondents' answer may be noted the allegation that "no factor other than the applicant's work on the examination *has any bearing* upon his success or failure in the examination". The purport of that language is that whatever may be petitioner's background, scholastically or otherwise, or however extensive and varied and otherwise

important may have been his life-work, or his experience or his training in the law, in business, or in other pursuits of life, or whatever may be his established—practical or demonstrated—fitness to practice law by reason of his general legal or other knowledge, or his integrity,—none of nor all such and other qualifications has or have *"any* bearing" but, to the contrary, count for naught. Therefore, it would seem that no reason appears for an applicant, prior to being granted permission to take the examination, to be required to make any showing regarding either or any of such various or other matters hereinbefore set forth. (Emphasis added.)

As related to the system employed by the respondents in grading answers to questions, it should be obvious that in grading an examination paper the giving of *"a bonus"* to any applicant *"who includes a discussion which is not necessary for full credit, but which, nevertheless, is relevant"* may or might result in unjust discrimination as to other applicants. As a single illustration of how such rule injuriously may have affected petitioner, it is clear that if on examination of the several questions and the respective answers made thereto by petitioner it should appear that in reality, as to one or several answers, he was entitled to *"a perfect mark"*, the fact that he was not accorded a bonus as to one particular answer, or a bonus as to each of several different answers, may have unjustly affected his total appropriate credit.

Contained within the respondents' "Return to Alternative Writ of Mandate and Brief on Behalf of the State Bar" is the allegation that "At that examination [October, 1939] 718 applicants for admission to practice were examined and of that number 254 were found to have passed the examination and were certified to this court and recommended for admission to practice law in the State of California. Respondents have discharged the duties imposed upon them by law in connection with said examination and the Committee of Bar Examiners has heretofore exercised *the best judgment which it has in the premises* and has rendered to this court its carefully considered determination as to the result of that examination and has already moved the admission of those applicants which it in good conscience could recommend to the court." (Emphasis added.) Apparently that allegation, in its entirety, was made inadvertently or, if not, it must have been made for the express purpose of inviting adverse and

drastic criticism with regard to *the best judgment* of the committee. And although the respondents have placed themselves in that vulnerable position, it may be that the dignity of the court should forbid any direct response to the invitation thus extended.

Suggested as a matter of great consequence, and as impliedly constituting an additional if not an impelling reason why petitioner should not be permitted to practice law in this state,—in effect, the respondents assert that petitioner was afforded a reasonable period of time to consider the questions and to make his respective written answers thereto, in that he was allowed 48 minutes for each answer. In that regard, the statement of the respondents is as follows: "Inasmuch as applicants at the present time are required to answer twenty-six questions given in six three-and-one-half-hour sessions, they have an average of *slightly more than 48 minutes for each answer.*" (Emphasis added.)

In that connection, further requirements on the part of such applicants are set forth by the respondents as follows: "All questions on the examination are of the long-form or essay type. They consist of a hypothetical case involving *several* principal points of law and require from the applicant *careful analysis of the facts* presented and *a full discussion of the legal problems* involved. The questions are from 200 to 300 words in length and are so expressed as not *unduly to confuse the applicant* while yet retaining *the necessity for legal analysis and a display of legal reasoning.*" (Emphasis added.) In view of the points presented by such statement, it might not be inappropriate to refer to some of the questions (without again setting them forth herein) which petitioner was required to answer, in writing, in the allotted space of 48 minutes. To my mind, the situation presented to an applicant of requiring from him, within such allotted time, a *"careful analysis of the facts"*, *"a full discussion* of the legal problems involved" and *"a display of legal reasoning"* would be, to say the least, both bewildering and disconcerting, if not actually alarming. It seriously may be questioned whether any reputable lawyer, who has successfully practiced law in this state for a period of 10 years or longer, would consider such a feat possible within a space of 48 minutes, even with respect to any one of the several minor points of law here presented for solution in any of the major

questions which the applicant was called upon to answer. Furthermore, as to any one of such major questions, it would be even doubtful that, provided with a well-equipped law office, with all pertinent digests, law reports, secretaries and research workers necessary or advisable for the purpose, any lawyer who valued his good reputation as such would undertake to present, in much less than 48 hours, "a careful analysis of the facts" and "a full discussion of the legal problems involved", together with "a display of legal reasoning". And especially would such performance be doubtful where, in addition to the difficulties already present, the said lawyer would have to bear in mind the fact that the correctness of his answer to such question was to be tested, not by a group of experienced, practical and tolerant lawyers, who might recognize the fact that law is not an exact science, but by a body of "15 recent graduates of a number of different law schools", and that the answer given, to be considered "perfect", or even entitled to a passing grade, must first be deemed to practically coincide with the "analysis" or formula theretofore prepared by the committee of bar examiners, and thereafter be graded by the said body of "recent graduates". To my mind, if the conditions prescribed and approved by the respondents, which were required and demanded of petitioner, did not amount to an imposition as to him, and did not result in unfair and unjust treatment as far as he was concerned, it would be difficult to imagine just what conditions should exist in order to invoke the application of the rule reiterated by this court in its opinion in the Salot case (*Salot* v. *State Bar,* 3 Cal. (2d) 615 [45 Pac. (2d) 203]). In that case it was intimated that if an unsuccessful applicant for admission to practice law in this state could show that his application was rejected "through fraud, imposition or coercion, or that he had been treated unfairly or unjustly", this court *would* "listen to his complaint".

But to return to the specific questions and the respective answers thereto that are involved in this proceeding: In the first place, realizing, if possible, my own lack of legal knowledge, nevertheless, with the fullest confidence I venture to predict that if, for the purpose of passing upon the question of the fitness of petitioner to practice law in this state, the identical questions which were propounded to petitioner and the respective answers that were made thereto by him were

submitted to a committee composed of 15 average members of the bar, the result of its consideration thereof would be favorable to petitioner, and would be followed by a recommendation by such committee that petitioner be admitted to practice law in this state.

As hereinbefore has been indicated, most lawyers are painfully cognizant of the fact that law is not an exact science, and that with reference to practically any controversy which involves an admitted set of facts a given conclusion of law regarding the respective rights of the several parties thereto will prove almost impossible of agreement as among any considerable number of practicing attorneys,—which is to intimate that as great a number of attorneys will be found who favor a given legal conclusion as will be found who dissent therefrom. If that were not true, very few actions or suits would ever reach the courts. In every lawsuit, or appeal from a judgment, about as many lawyers appear therein in the interest of the defendant as appear in behalf of the plaintiff.

Although it is vigorously asserted by the respondents that they do not require "a perfect answer" to each or any of the questions that are propounded to an applicant, but that, to the contrary, they accord him some credit for an answer that does not agree with their previously prepared "analysis" or formula (provided such answer be logical and well-reasoned),—nevertheless, the several grades that were given to petitioner herein on his respective answers compel the obvious conclusion that petitioner's answers could not have been accorded more than a negligible credit in those instances where it was apparent that his answers had failed to agree with the analysis or *formulae* which previously had been prepared by the respondents. A careful check of the cases that are reported in the last two issued volumes of the reports of the United States Supreme Court reveals the following facts: that 7 cases therein were decided by a vote of 8 to 1 of the honorable justices of that court; that 5 cases were decided by a 7 to 2 vote; that 2 cases were decided by a 6 to 2 vote; 3 cases by a 6 to 3 vote; 3 cases by a 5 to 3 vote; and that 2 cases were decided by a 4 to 3 vote. Another illustration of the inability of judges to agree with respect to the law which should apply to a case that has been decided on findings of fact is as follows: where an appeal from a judgment has

been taken to the appellate court, a decision thereon contrary to that of the trial court may be rendered by a 2 to 1 vote of the justices of the said appellate court; thereafter, should a hearing be granted in this court, the decision that was rendered by the appellate court may be reversed by a 4 to 3 vote of the members of this court; and if the case should be one of which the Supreme Court of the United States will or may take cognizance, the decision therein may be rendered by a 5 to 4 vote, by which the judgment theretofore rendered by this court will be reversed. Such is the certainty of the law! From which it should follow that the opinion of one lawyer may be deemed to be as good as that of any other, and that each of such opinions is entitled to respect, dependent on the reasoning which may be urged or presented in its support,—at least until after a final decision on the issue therein involved has been rendered by the court of last resort.

As though constituting an additional argument why petitioner should not be accorded the relief sought by him, the respondents direct attention to the fact that when the bar examination under consideration was conducted, although there were 718 applicants for admission to practice law in this state, 463 of that total number were unsuccessful. In that connection, considering the several statutory requirements of an applicant under the age of 25 years with which he must comply before he may even take the examination,— which include "at least 2 years of college work", graduation either from "a law school accredited by the examining committee requiring substantially the full time of its students for three years" or "from a law school accredited by the examining committee requiring a part only of its students' time for four years", or the study of law "diligently and in good faith for at least four years",—to my mind, it amounts to a practical demonstration that there is something radically wrong with the system that is pursued by the respondents in conducting the examination and in grading the answers of the applicants to the questions presented to them. Certainly it taxes one's confidence in the fairness of an examination which will admit of the "flunking" of 463 out of a total of 718 duly accredited applicants. It must be apparent that, ordinarily, young men under the age of 25 years who have had "at least 2 years of college work", and who after 3 or 4 years of study therein have been graduated from an accredited

law school, should not, and I am persuaded would not, be unsuccessful in the taking of any fairly-conducted bar examination. The law does not demand, nor has the public any right to expect, *perfection* in legal knowledge by any person before he may be permitted to practice law in this state. The principal quality to be possessed by such an applicant should be that of personal integrity; and I suggest that if in the future the respondents were to devote a fair percentage of their official time to the task of considering and determining whether an applicant for admission to practice law in this state be unreservedly and unquestionably entitled to be respected as an honest person, and that as a matter of right and justice he should merit the entire confidence of all respectable and respected citizens, whether of this state or elsewhere,—a greater and more meritorious service to the general public would be performed than may be secured by an academic examination of an applicant regarding the questioned legal ownership by John Brown or Peter Smith of either ''Blackacre'' or ''Whiteacre'', or, indeed, whether a good title would or could be secured by a *bona fide* purchaser of a pair of shoes that was made from leather which was obtained from the hide of Nellie's or Bossy's calf (see question No. 1).

·The fact that a considerable number of the applicants to practice law in this state were successful in the examination here in question may not be considered as proof that imposition or unfairness was not exercised or present on the part of the respondents in conducting the examination. Rather, on a consideration of the questions that were propounded to the applicants as well as of the various and sundry conditions which were attached to the examination, as hereinbefore has been indicated, to my mind, the result simply is suggestive of the thought that those who were successful were either of superintelligence as compared to the less fortunate applicants, or that each of the successful applicants was a ''guesser'' of superlative ability.

Additionally, perhaps it should not be intimated that if, as a condition to continued tenure of office as a member of the Supreme Court of this state, each of such members were required to take and to successfully pass a yearly examination under conditions similar to those which were imposed upon

petitioner herein,—it would be safe to surmise, if not to assert, that as a result thereof (with certain well-recognized exceptions thereto—to which exceptions I lay no claim to membership) opportunities to the governor of this state to make appointments to fill vacancies on this bench probably would be approximately identical with the number of members of this court. However, of course in no event should such a suggested requirement (in principle) be extended to apply to the membership of any other state agency!

Although precedents may be found and so-called "authorities" may be cited to the effect that no person has a vested right to practice law in this state, nevertheless from the fact that a constitutional privilege inheres in the individual to exert and to use his faculties and energy in any manner that he may see fit,—subject to pertinent constitutional inhibitions and statutory regulations,—a citizen does possess a right to practice law, equally with his right to adopt and to pursue any other vocation, trade or calling. That right is a valuable asset of property—as much as is a right or interest in any other kind of property, real or personal; and the denial of the privilege to practice law usually inflicts a more severe loss to the rejected applicant than would be represented by the total loss to the average man of like age of all his assets of every kind or nature. And the damage suffered by the former may not be, and generally is not, confined to a short or limited period of time following the refusal of the requested privilege, but, to the contrary, may pursue him during a long period of succeeding years, or even throughout his remaining lifetime. The examination of applicants for admission to practice law thus becomes an extremely important matter; and the examiner or person entrusted with the final disposal of so valuable a right should be mindful thereof in the conduct of such examination and the determination of the question presented.

Ordinarily, under our system of government, the determination of conflicting rights or privileges of individuals as between or among themselves, or of the state, is entrusted to judicial officers. Such officers should not be chosen solely because of their admitted theoretical or academic knowledge of the law. Something more than that should be required. They should be, and usually are, chosen or delegated to so

act not merely for the reason that they are presumed to be learned in the law, but rather, particularly, because of their known integrity, open-mindedness and general tolerance in thought regarding human affairs,—and, if practicable, because of their long and varied experience in considering or in dealing with the solution of problems which have affected or which may seriously affect vital interests of their fellows.

All the respondents herein, and including the "readers" who are "highly skilled . . . recent graduates of different law schools" may be, and presumably are, possessed to a marked degree of each and all of the assumed desirable qualifications to which reference just has been had. In that regard, no complaint is or perhaps properly may be made excepting that with respect to the group last mentioned it is obvious that the members thereof could not have had such a length of experience in the practice of the law as might seem desirable.

It is doubtful that if any member of the board of governors of The State Bar, or of the committee of examiners, were to represent a client who was a party in any litigated cause which involved a decision regarding a property right, great or small, he would be willing to have such right determined by any one or more of a group of "highly skilled . . . recent graduates of different law schools". To the contrary, at least as far as might be possible or practicable, it is most probable that he would insist upon having a decision made or rendered by a regularly elected or appointed and thoroughly qualified judge, whether or not such officer possessed each and all of the recognized qualifications for his office.

It seems irresistibly to follow that in the matter of such great importance as that of determining whether an applicant should be admitted to practice law in this state the determination thereof should rest with some person or persons of learning and experience equal to that confidently expected to be possessed by a judicial officer of the government of the state.

To my mind, it becomes manifest that petitioner has sustained the burden which by the terms of the majority opinion is declared to rest upon him,—that is, "to show" either in what manner he was imposed upon, or wherein the conclusion of the board, as to petitioner, was unfair or unjust.

In my opinion, the petition should be granted, and petitioner be admitted to practice law in all the courts of this state

Carter, J., concurred.

A petition for a rehearing was denied February 27, 1941. Houser, J., and Carter, J., voted for a rehearing.